A. ROSS WINANS GRANTOR TRUST, WILLIAM A. MALIS, TRUSTEE, ET AL., * Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent A. Ross Winans Grantor Trust v. Commissioner
Docket Nos. 12684-83; 13781-83; 22984-83; 16789-84; 20239-84; 12364-85; 16429-85; 22951-86; 23383-86; 24330-86; 37873-86; 40729-86; 17733-87
United States Tax Court
T.C. Memo 1989-653; 1989 Tax Ct. Memo LEXIS 655; 58 T.C.M. (CCH) 884; T.C.M. (RIA) 89653; December 12, 1989
Alfred R. Westfall, Robert B. Martin, Jr., and John Deacon, for the petitioners in all docket numbers. Bruce I. Hochman and Steven Toscher, for the petitioner in docket No. 37873-86. Lynda Taylor, Jeffrey Sherman, and Phoebe Tang, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Sec.
Petitioner &
Sec.
6653(a) or
Sec.
Docket No.
Year
Deficiency
6651(a)(1)
6653(a)(1) *
6653(a)(2)
Winans Trust
12684-83
1979 $   5,811
--
$    291.00
--
Winans
13781-83
1979 103,293 --
5,165.00
--
16789-84
1980 81,913
--
4,096.00
--
12364-85
1981 126,069
--
6,303.00
**
24330-86
1982 529,582
--
26,479.10
**
Swainn Trust
23383-86
1982 494,525
--
24,726.00
**
Fowler
22984-83
1979 34,412
--
1,721.00
--
20239-84
1980 37,219
--
1,861.00
--
16429-85
1981 31,553
-- 1,577.65
**
22951-86
1982 131,384
--
6,569.20
**
Uversa, Inc.
17733-87
1982 37,463
--
1,873.00
**
1983 149,517
--
7,476.00
**
Steinbrecher
37873-86
1982 131,255
$ 30,469.25
6,841.70
***
Jasmine
40729-86
1983 **** **** ****    **** *660 Additions to Tax
Petitioner &
Sec.
Sec.
Docket No.
Year
6659
6661
Winans Trust
12684-83
1979
--
--
Winans
13781-83
1979
--
--
16789-84
1980
--
--
12364-85
1981
$ 37,821.00
--
24330-86
1982
15,610.80
$ 49,441.20
Swainn Trust
23383-86
1982
--
49,453.00
Fowler
22984-83
1979
--
--
20239-84
1980
--
--
16429-85
1981
7,644.30
--
22951-86
1982
5,622.60
12,687.60
Uversa, Inc.
17733-87
1982
--
9,366.00
1983
--
37,379.00
Steinbrecher
37873-86
1982
--
--
Jasmine
40729-86
1983 **** ****
Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended *661 and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues remaining for decision are: I. Grantor Trust Issues (1) whether petitioners Winans and Fowler are entitled to deductions in connection with their investments in thoroughbred horses; (2) whether petitioners Winans and Fowler are entitled to report the sales of their interests in thoroughbred horses on the installment basis; and (3) whether petitioners Winans and Fowler are subject to additions to tax as set forth above. II. Partnership Level Issues (1) whether the thoroughbred broodmare leasing programs established by petitioners Uversa and Jasmine are bona fide trades or businesses. III. Partner Level Issues (1) whether petitioners Uversa, Inc. and Steinbrecher, as partners in Uversa and Jasmine, respectively, are entitled to deduct losses with respect to the thoroughbred horse investments of the partnership; (2) whether Uversa, Inc. underreported taxable income by $ 49,662 for the year ended November 30, 1983; (3) whether Uversa, Inc. is entitled to deductions for attorney fees, commissions, and depreciation; *662 and (4) whether petitioners Uversa, Inc. and Steinbrecher are subject to additions to tax as set forth above. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. At the time they filed their petitions, the individual petitioners were all residents of California, and the entities had their principal places of business in California. The Thoroughbred Industry
The thoroughbred industry has as its goal the breeding and raising of horses that will achieve success at the racetrack. In addition to the racetrack earning power of the horse, there are other areas in which the owner of a thoroughbred horse has the potential to make money. A successful male horse (stallion) can command attractive syndication prices when he is sold to a syndicate in which more than one person shares in the ownership of the horse. Although they constitute a substantial economic industry, thoroughbred racing and breeding transactions are frequently conducted without formal documentation. A stallion is normally syndicated into 40 undivided fractional interests (shares), with each share valued at *663 an amount between 3 to 5 times the breeding "nomination" cost or "stud fee." Syndicate shareholders gain the right to breed their female horses (broodmares) to the stallion each year. Alternatively, the syndicate shareholders can sell their breeding nominations or "seasons." During the thoroughbred's natural mating season from February 15 to June 15 each year, the average stallion will breed to some 50 or 60 mares. Artificial insemination is not used to breed thoroughbreds. A broodmare's value is determined by her pedigree (family history), race record, and physical conformation. Pedigree is the more heavily weighted variable. The values of the top female racehorses are enhanced beyond their racetrack earnings when they are bred to stallions. Owners of broodmares can breed their mares to stallions in which they own syndicated breeding rights or to stallions in which breeding rights for that season have been purchased. Breeding rights can be purchased either privately or at auction. The value of a breeding nomination is a statistical matter of record and is published in the private newsletter Racing Update. This publication also provides stallion yearling average values that *664 may be referred to when evaluating foals and yearlings. The universal birthday for all thoroughbred horses born in North America is January 1, regardless of when they are actually foaled. The gestation period is 11 months. Mares are generally bred no earlier than February 15 each year to prevent the possibility of having a foal born a few days prior to January 1, when it would be deemed to be a year old although actually newly born. Thus, most foals are born between January 10 and the end of May. The dam (mother) nurses her foal from birth until late summer when it becomes a "weanling." Weanlings can be offered at public auction in October and November and usually bring two-thirds of the price they would sell for as "yearlings" the following summer. If a broodmare conceives and successfully carries her foal through the 11-month gestation period, the young horse can be sold at auction, usually as a yearling, or kept by the owner to be raced. A female racehorse is normally given the chance to become a broodmare after her 4-year-old racing season and is bred as long as she is able to conceive. The average thoroughbred mare has her last foal between 15 and 20 years of age. *665 Top auction prices for single yearlings, a generally accepted barometer of the economic status of the thoroughbred industry, moved from less than $ 100,000 prior to 1960 to the multi-million dollar range in the early 1980's. In addition, single stallion syndications, another generally accepted barometer of the industry, increased during the same period from the $ 1 million range to over $ 30 million. The average price paid for yearlings sold at public auction in North America increased by 6.2 percent from 1973 to 1976, when 5,001 thoroughbred yearlings sold for an average of $ 13,021. By 1980, however, the number of yearlings sold increased by 41.5 percent to 7,079, and the average price increased by 128 percent t $ 29,683. Similarly, the average price paid for the 4,950 broodmares sold in North America in 1979 was $ 17,696, while the 1983 average price increased 93.3 percent to $ 34,208. The number of horses foaled each year increased from 37,100 in 1980 to 48,600 in 1983. While the average price of thoroughbreds increased steadily from 1973 to 1983, the increase in value of better quality horses was even more pronounced during this period. The Keeneland Race Course sales *666 in Lexington, Kentucky, are considered to be the measure of industry health. The Keeneland summer yearling sale of "select" horses (the sale company selects which horses it wants to sell) and the fall sale of top-quality broodmares were leaders in their respective categories. Average prices at the Keeneland summer select yearling sale increased by 25.1 percent, 29.6 percent, 22.8 percent, and 32.5 percent annually between 1979 and 1982, respectively. Average prices for broodmares sold at Keeneland in November increased by 50.4 percent, 53.7 percent, 5 percent, and 41.6 percent between 1978 and 1982, respectively. After 1984, thoroughbred prices fell to their pre-1982 levels, with the average Keeneland select yearling prices declining by 10.7 percent and 23.3 percent in 1985 and 1986, respectively, from $ 601,567 in 1984 to $ 411,755 in 1986. Jockey Club Registration
The Jockey Club is the thoroughbred breed registry in the United States. A Jockey Club "registration certificate" identifies a registered horse both by pedigree and by physical attributes. Pedigree records are maintained to establish the breeding of thoroughbreds. A thoroughbred horse is not allowed to *667 race in the United States unless the registration certificate is in the physical possession of the racing officials at each racetrack. When a thoroughbred horse is retired from racing to begin a breeding career, it needs only to have been registered on the rolls of the Jockey Club in order to qualify its offspring for future registration. Although physical possession of the registration certificate by the owner is necessary for a thoroughbred horse to race, once a horse is retired from racing, physical possession of the certificate is not a necessity. Accordingly, the importance of the certificate is very different in transfers of racehorses than in transfers of breeding horses. Delivery of the certificate and completion of the reverse side of the certificate usually accompany the transfer of title of a racehorse. Delivery of the certificate at the time of a transfer of title to breeding stock is not a necessity, and most sales of breeding thoroughbreds are not accompanied by a transfer of the certificate. In both circumstances, the primary document reflecting the transfer of title is normally a bill of sale and not the certificate. Malis and Sikura
William A. Malis (Malis) *668 is a certified public accountant and an attorney admitted to practice by the California State Bar. Malis has been involved in the thoroughbred horse business since he was 11 or 12 years old, and he has owned horses as well as used horses as a method of investment. From February 6, 1967, through April 21, 1972, Malis worked for the Internal Revenue Service (IRS) in the Los Angeles District. During his employment with the IRS, Malis co-authored a pamphlet titled "Guidelines for the Valuation of Thoroughbred Race Horses." Malis prepared this pamphlet for use by the IRS's estate tax examiners as a beginning point in valuing thoroughbred horses. On May 5, 1971, the IRS awarded Malis a Special Achievement Award for his work on thoroughbred horse valuations. During the years in issue, Malis practiced as a sole practitioner in South Pasadena, California. He represented a substantial number of clients engaged in the thoroughbred horse business. In the mid-1970's, Malis met John Sikura (Sikura) at the Santa Anita racetrack in Arcadia, California, where Sikura was racing some horses. ikura was a citizen and resident of Canada and had been active in the acquisition, sale, breeding, training, *669 and management of thoroughbred racehorses for over 25 years. During the years in issue, Sikura was the president, chief executive officer, and 100-percent owner of Hill 'n' Dale Farms (Hill 'n' Dale), a Canadian corporation. Hill 'n' Dale owned a farm in Canada consisting of approximately 160 acres, 70 box stalls, indoor and outdoor tracks, and a large number of paddocks. During the years 1979 through 1984, Hill 'n' Dale had from 25 to 90 thoroughbred mares available for breeding. At all relevant times, Sikura and Hill 'n' Dale had access to breeding rights to important stallions, some of which were not generally available to the public. In late 1976 or early 1977, Sikura and Malis began to discuss investments involving the breeding of thoroughbred racehorses. In view of the way the market was moving, Sikura advised Malis that the breeding business would be better than the racing business. Sikura believed that, by using the right mares and stallions in an escalating market, it would "be an absolute cinch to make money." Similarly, Malis believed that, because a thoroughbred mare could create new value through the reproductive process, it represented an investment that would *670 have an unlimited upside potential and a manageable downside risk. Accordingly, Malis and Sikura formulated a plan to purchase thoroughbred broodmares together with future assurances of breeding nominations to thoroughbred stallions. Malis then proposed these investments in thoroughbred mares to some of his most valued clients. During the years in issue, Malis undertook investments in thoroughbred horses for approximately 10 of his 400 clients. Grantor Trust Transactions - Overview
Malis suggested that clients interested in investing in thoroughbred horses do so through a grantor trust. Acting as trustee for his clients, Malis had the discretion to control and manage the investment. Malis was to select the thoroughbred broodmares for purchase. Sikura was to provide assurances of the availability of future breeding nominations to thoroughbred stallions within a certain range of value, i.e., stallions having a syndicated value of between $ 3 million and $ 8 million. In each case, the stallion breeding nominations were to be selected by Malis in consultation with Sikura. Malis intended to select stallions valued at the middle of the agreed range. The grantor trust investment *671 contracts called for a cash down payment of 20 to 25 percent and a recourse promissory note. Sikura had used such notes in his business for approximately 15 years prior to the investments at issue. In each case, there was to be a right of exchange permitting the investors to exchange the horses purchased for other horses during the first 18 months of the investment. The parties intended that this right of exchange would permit only the exchange of horses of equivalent value. Malis considered the right of exchange to be a form of warranty of value. For each of the grantor trust investments, Malis intended to acquire a thoroughbred mare in foal, plus five stallion breeding nominations. Malis contemplated a 7-year breeding program whereby each broodmare would produce six foals. At the inception of the investments, Malis had no intention of selling the mares or their foals to Hill 'n' Dale. Hill 'n' Dale had no options to purchase the mares or foals and had no right of first refusal. In early 1977, Malis employed his brother Sam A. Malisos (Malisos) to manage the administrative details of the thoroughbred activities involving his clients. Malisos received an undergraduate degree *672 in literature, did graduate studies in English, and taught school in New Hampshire and California. Initially, Malisos evaluated the pedigrees of thoroughbred horses considered for investment and estimated their values. After the thoroughbreds were purchased, Malisos was responsible for all the administrative details of the investments, including banking, accounting, and tax return preparaton. In addition, Malisos kept track of the use of stallion breeding seasons. Sikura usually did business by a "handshake" and did not request rigid documentation of the transactions. Generally, Malis and Sikura would reach an agreement orally, and subsequently Malisos would prepare the documentation. Because the documentation was prepared after the fact, Malis used the term "effective as of " to indicate the date the oral commitment was made. Malis, however, never put dates on checks other than the actual date the checks were prepared. Malis and Sikura agreed that Sikura's name would be listed on the Jockey Club registration certificates for the thoroughbred horses purchased by Malis' clients. Sikura believed that he could obtain more money for horses sold under his own name than if he *673 were listed as agent for someone else. Malis believed the arrangement was one of convenience for his clients, because the horses were to be boarded with Sikura at Hill 'n' Dale. During late 1980, Malis employed Tyson Gilpin (Gilpin) to physically inspect all of the horses owned by Malis' trust clients. Malis requested this appraisal to monitor the progress of his clients' thoroughbred investments. Gilpin was one of two or three appraisers recommended to Malis by Sikura. Gilpin was to give Malis an opinion of the values of the horses as of the date of the inspection, as well as the values of the remaining breeding nominations. Gilpin went to Hill 'n' Dale and personally examined every horse. On or about January 12, 1981, Malis obtained Gilpin's appraisal of the value of the horses and the remaining breeding nominations. In early 1982, Sikura learned that Malis and his clients had become the subject of a criminal investigation by the IRS. As a consequence, Sikura offered to buy all the thoroughbred interests then owned by Malis as trustee. Malis used the Gilpin appraisals, as well as the advice of others, in determining the fairness of the price offered by Sikura. Malis believed *674 that he could maximize the sales price by selling all of the thoroughbred horses as a package. Malis and Sikura reached an agreement on the overall purchase price for the package of horses in April or May of 1982. ITBA and Related Persons
The International Thoroughbred Breeders Association (ITBA) was a corporation formed in the Netherlands Antilles in January 1979. Sikura and Sarkos Simonian (Simonian) were each 50-percent shareholders of ITBA. Sikura, however, had sole discretion with respect to ITBA's thoroughbred horse transactions. Malisos was to receive 4 percent of ITBA's profits payable out of Simonian's share of the profits. At no time did Malis own any stock in ITBA or have any interest in its capital or profits. Malis, however, acted in the capacity of an attorney for ITBA. Legal work done by Malis for ITBA was done by Malis in the interest of his clients. Malis never received any fees for acting as an attorney for ITBA. ITBA was established in the Netherlands Antilles to avoid withholding tax on interest payments to a Canadian corporation. ITBA's business purpose was to buy and sell horses in Europe and the United States. ITBA maintained bank account *675 no. 116-028-111 at Security Pacific National Bank. This account was maintained with the knowledge and consent of Sikura to facilitate cash transfers from the United States to Canada. All of the checks drawn on ITBA's Security Pacific Bank account bore the signature of Henry Wallers, a representative of ITBA. The initial deposit used to open ITBA's account at Security Pacific National Bank was made by a check drawn on the Malis Client Trust Account, no. 504-878. The address for ITBA's account at Security Pacific National Bank was c/o P.O. Box 1402, South Pasadena, California 91030. This was the same address used for Malis Client Trust Accounts no. 116-522-482, no. 116-107-257, and no. 116-106-401, and Hill 'n' Dale account no. 116-079-992. Hill 'n' Dale boarded the thoroughbred horses owned by Malis' clients. Hill 'n' Dale's records and stall cards reflected that the horses were owned by Malis as trustee. Hill 'n' Dale billed Malis for the board and care of his clients' horses. Initially, Hill 'n' Dale sent Malis itemized bills. Subsequently, Malis and Hill 'n' Dale agreed on a flat rate per horse. Malis in turn established a fixed periodic fee payable by his clients for *676 the board and care of their horses. Simonian was the intermediary for the board and care payments from Malis' clients to Sikura and Hill 'n' Dale. Simonian was entitled to any difference between the amounts charged by Sikura for board and care and the fixed fees established by Malis and payable by his clients. During the years in issue, Hill 'n' Dale of California maintained a bank account at Security Pacific National Bank; in 1982, that account was closed. Malisos was an authorized signatory on this account. Thereafter, amounts for board and care were paid to Graymette Limited, a company owned by Simonian. As indicated above, Malis agreed to sell to Sikura the thoroughbred interests held by his clients after Malis advised Sikura in early 1982 that the IRS was challenging the thoroughbred horse transactions. On September 29, 1985, Malis and Sikura entered into an agreement wherein the parties agreed that further payments by Malis, on behalf of his trust clients, to ITBA were to be suspended pending final resolution of the IRS challenge to the thoroughbred transactions. On October 20, 1985, Malis and Hill 'n' Dale entered into a similar agreement wherein the parties agreed *677 that further payments by Hill 'n' Dale to Malis, on behalf of his trust clients, were also to be suspended pending final resolution of the IRS challenge. The Winans Grantor Trust
In 1973, petitioner A. Ross Winans (Winans) was senior vice president of Denny's, Inc., a New York Stock Exchange listed corporation. In 1974, Winans met Malis, who had been hired by Denny's, Inc. to provide financial and tax advice to company executives. Malis gave Winans estate planning advice and drew up a will and a family trust for him. Winans was nearing retirement age and decided that he should engage in additional investments while he was still working. Malis provided Winans with investment advice, suggesting real estate investments and various stock purchases. Winans was particularly interested in investments that would increase in value over time, keeping pace with or staying ahead of the double-digit inflation of those years. With this investment objective in mind, Malis suggested that Winans consider an investment in thoroughbred horse breeding. Although Winans did not have any experience in this type of investment, he discussed the investment with Verne Winchell, Chairman of the *678 Board of Denny's, Inc. , who had been a breeder of thoroughbred racehorses for many years. Winans believed that Malis had considerable experience in the thoroughbred horse industry. Based on Verne Winchell's past performance and Malis' experience in the industry, Winans decided to invest in thoroughbred horses. Malis and Winans discussed both the economics and the income tax consequences of the proposed investment. Due to his business background, Winans was aware of the income tax results of various investments, and he considered the tax consequences as well as the profit potential and risk involved. Malis advised Winans on the expected life of the investment and the depreciation methods available. Winans chose to take straight line depreciation to avoid the recapture that would result from a double declining balance method of depreciation. On February 6, 1979, Winans established the Winans Grantor Trust (Winans Trust) pursuant to a "Declaration of Attorney/Client Trust Account, Agency Certificate and Grantor Trust." Although under paragraph 1 of this document the Winans Trust was named the Swainn Grantor Trust, we refer to it as the Winans Trust. The stated purpose of *679 the Winans Trust was "the racing and exploitation of thoroughbred horses for profit." Pursuant to the trust, Winans granted Malis, as trustee, the power and responsibility to perform all acts necessary for the investment. Specifically, the trust document provided that Malis, as trustee, would have the power "To do all such acts, take all such proceedings and exercise all such rights and privileges in the management of the Trust Estate as if [he] were * * * the absolute owner thereof." Further, Malis was given the authority to incur debts and obligations on behalf of the trust. The trust document provided, however, that Winans was at all times to be personally liable for all debts and obligations of the trust, whether or not the debts and obligations exceeded the trust estate. On January 5, 1979, Hill 'n' Dale transferred to ITBA all of its interest in and to the thoroughbred mare Pagan Pagan. Sikura purchased Pagan Pagan in 1976 for $ 16,500. On February 6, 1979, the Winans Trust entered into a contract with ITBA to purchase Pagan Pagan. In 1979, Pagan Pagan was 10 years old. As part of the purchase price, ITBA agreed to provide five rights to breed the mare to thoroughbred *680 stallions standing at the major stallion stations whose per cover basis and/or syndicated value represented a present value of not less than $ 3 million nor more than $ 8 million to be selected by Malis through the 1983 breeding season. ITBA intended to purchase the required breeding nominations from Sikura. The contract between the Winans Trust and ITBA specified that the purchase price for Pagan Pagan and the five breeding rights was $ 825,000. The purchase price was payable by $ 175,000 in cash and a promissory note in the principal sum of $ 650,000. On June 7, 1979, Malis, on behalf of Winans, transferred $ 175,000 from the Malis Client Trust Account to ITBA's account, representing the cash down payment on the purchase of Pagan Pagan. Winans paid the balance of the purchase price by the execution and delivery of a promissory note dated February 6, 1979, in favor of ITBA in the principal sum of $ 650,000 with interest at 10 percent per annum. The principal was due and payable by February 6, 1985. During the years in issue, Winans paid the following amounts as interest on the promissory note to ITBA: Year
Amount
1979
$ 59,583
1980
65,000
1981
65,000
1982
48,750
*681 At all times during the years in issue, Pagan Pagan and her foals were located at Hill 'n' Dale, Gormley, Ontario, Canada. Malis, as trustee of the Winans Trust, appointed Sikura as attorney-in-fact to exercise all powers in connection with Pagan Pagan. During the years in issue, Winans paid the following amounts as board and care for Pagan Pagan and her foals: Year
Amount
Payee
1979
$ 27,500
Hill 'n' Dale
1980
15,000
Hill 'n' Dale
15,000
Graymette, Ltd.
1981
30,000
Graymette, Ltd.
1982
25,000
Graymette, Ltd.
At the time of the contract for sale, it was understood that Pagan Pagan was to be bred to the stallion Bold Bidder during the 1979 breeding season. Pagan Pagan was bred to Bold Bidder during the 1979 breeding season, but the foal was stillborn. ITBA acquired the Bold Bidder 1979 breeding nomination from Sikura. Sikura purchased these breeding rights from Gainesway Farm for $ 30,000 with a live foal guarantee. Because Pagan Pagan did not produce a live foal as a result of the breeding, Sikura was not required to pay for the breeding. During the 1980 breeding season, Pagan Pagan was again bred to Bold *682 Bidder. As a result of this breeding, Pagan Pagan produced a live foal in 1981. ITBA also acquired this breeding nomination from Sikura. Sikura purchased the Bold Bidder 1980 breeding nomination from Gainesway Farm for $ 50,000 with a live foal guarantee. During the 1981 breeding season, Pagan Pagan was bred to the stallion Vice Regent. As a result of this breeding, Pagan Pagan produced a live foal in 1982. ITBA acquired this breeding nomination from Sikura. Sikura paid approximately $ 35,000 for the breeding nomination. During the 1982 breeding season, Pagan Pagan was bred to the stallion Stalwart. On September 7, 1982, Pagan Pagan was in foal to Stalwart. ITBA acquired this breeding nomination from Sikura. Sikura paid approximately $ 20,000 for the breeding nomination. Prior to September 7, 1982, Winans had become disappointed in his thoroughbred horse breeding investment. Pagan Pagan's first foal had died, and her second foal was sickly. As a result of Pagan Pagan's foaling history, Winans had expenses of maintaining the investment but had no income from sales of foals or from racing. Thus, Winans advised Malis that he wished to sell Pagan Pagan. Prior to September 7, 1982, the *683 Winans Trust owned (i) Pagan Pagan then in foal to Stalwart, (ii) a 1982 colt by Bold Bidder/Pagan Pagan, (iii) a 1982 colt by Vice Regent/Pagan Pagan, and (iv) two breeding nominations. Pursuant to an agreement and bill of sale dated September 7, 1982, the Winans Trust agreed to sell its interest in Pagan Pagan and her progeny to Hill 'n' Dale for $ 1,000,000. Under the terms of the agreement and bill of sale between Hill 'n' Dale and the Winans Trust, the purchase price of $ 1,000,000 was payable by $ 210,000 in cash and a promissory note in the principal amount of $ 790,000. The promissory note was payable interest only at the rate of 8 percent per annum, with the principal due September 7, 1992. Pursuant to an agreement between Malis, as trustee, and Hill 'n' Dale, the parties agreed to allocate the $ 1,000,000 purchase price as follows: Thoroughbred mare
$   560,000
Offspring
290,000
Remaining breeding rights
150,000
Total
$ 1,000,000
Malis, as trustee, and Hill 'n' Dale also agreed to a contingent readjustment of the purchase price should Pagan Pagan or either of her first two foals at anytime win a graded stakes race. For each *684 such win, the purchase price was to be increased as follows: Graded Race
Price Increase
1
$ 100,000
2
75,000
3
50,000
In order to obtain the release of ITBA's purchase money lien on Pagan Pagan, her offspring, and the remaining breeding nominations, Winans agreed to increase the principal balance of his $ 650,000 note due February 6, 1985, by 10 percent. This additional 10 percent, or $ 65,000, had not been paid as of the time of trial in 1989. By check dated December 8, 1982, Hill 'n' Dale paid $ 210,000 to Malis, as trustee, as the initial payment on the purchase of Pagan Pagan, her offspring, and the remaining breeding rights. The balance of the purchase price was paid by a promissory note in the principal amount of $ 790,000. The note bore interest at 8 percent per annum and was payable interest only, with the principal due by September 7, 1992. Winans reported the sale on the installment basis and recognized a gain of $ 113,820 in 1982. Of this amount, Winans reported $ 96,747 as ordinary income and $ 17,043 as long-term capital gain. The Winans Trust is taxable as a grantor trust. The Winans Trust timely filed Fiduciary *685 Income Tax Returns using the accrual method of accounting. Winans reflected the income and deductions of the Winans Trust on his joint income tax returns for the years in issue. Winans deducted losses from the grantor trust of $ 174,959, $ 197,428, and $ 197,428 on his joint income tax returns for 1979, 1980, and 1981, respectively. Respondent disallowed these losses in full because Winans failed to establish (1) that the transaction was entered into for profit, (2) that the transaction was other than a tax-avoidance device, (3) that the transaction had any business purpose or economic reality, (4) that the grantor trust was engaged in a trade or business, and (5) that any expense for which a deduction was claimed was paid or incurred for the purpose claimed. Respondent determined additions to tax for each of the years in issue, as set forth above, and determined that commission income of $ 20,024 reported by the grantor trust in 1979 was taxable to Winans. Respondent also determined that Winans was not entitled to report gain on the sale of the thoroughbred horses in 1982 on the installment basis and included the entire sales proceeds as ordinary income. The Fowler Grantor *686 Trust
Petitioner Charles Douglas Fowler (Fowler) is an orthodontist practicing in Riverside, California. Fowler met Malis in 1966 when the two of them were serving in the U.S. Coast Guard. In addition to being personal friends, Malis performed estate planning services for and discussed investments with Fowler. In 1978, Fowler asked Malis to recommend investments that would provide tax relief as well as make money. During December 1978, Fowler and Malis discussed the economics as well as the tax consequences of an investment in thoroughbred mares. In January 1979, Fowler established the C. Douglas Fowler Grantor Trust (Fowler Trust) pursuant to a "Declaration of Attorney/Client Trust Account, Agency Certificate and Grantor Trust." Although under paragraph 1 of this document the Fowler Trust was named the Wolfer Grantor Trust, we refer to it as the Fowler Trust. The stated purpose of the Fowler Trust was "the racing and exploitation of thoroughbred horses for profit." Pursuant to the trust, Fowler granted Malis, as trustee, the power and responsibility to perform all acts necessary for the investment. Specifically, the trust document provided that Malis, as trustee, would *687 have the power "To do all such acts, take all such proceedings and exercise all such rights and privileges in the management of the Trust Estate as if [he] were * * * the absolute owner thereof." Further, Malis was given the authority to incur debts and obligations on behalf of the trust. The trust document provided, however, that Fowler was at all times to be personally liable for all debts and obligations of the trust, whether or not the debts and obligations exceeded the trust estate. At December 31, 1978, the thoroughbred broodmares Main Saggy, Corniche, and Bellenoble were owned by Hill 'n' Dale and were carried on the Hill 'n' Dale inventory listing at $ 10,000, $ 19,500, and $ 77,000, respectively. Main Saggy was foaled in 1959, Bellenoble was foaled in 1972, and Corniche was foaled in 1975. On January 3, 1979, Hill 'n' Dale transferred to ITBA all of its interest in and to Bellenoble, Main Saggy, and Corniche. At that time, Bellenoble was in foal to the stallion Youth, Main Saggy was in foal to the stallion Knightly Dawn, and Corniche was not in foal. Effective January 11, 1979, the Fowler Trust entered into a contract with ITBA regarding Bellenoble, Main Saggy, *688 and Corniche. Although not specified in the contract, the parties agreed that the Fowler Trust was acquiring a 20-percent fractional undivided interest in the mares. The contract did not specify this 20-percent interest because of an error by Malisos in transcribing the terms of the transaction. The purchase price for the Fowler Trust's 20-percent interest in the mares was $ 235,000. The purchase price was payable $ 43,750 in cash and a promissory note in the principal amount of $ 191,250 due January 11, 1985. The Fowler Trust's down payment was deferred until Malis received commitments for 100 percent of the thoroughbred investment. As part of the purchase price, ITBA agreed to provide five rights for each mare to breed the mares to thoroughbred stallions standing at the major stallion stations whose per cover basis and/or syndicated value represented a present value of not less than $ 3 million nor more than $ 8 million to be selected by Malis through the 1983 breeding season. It was the understanding of the parties that there were five such breeding rights for each broodmare. On July 25, 1979, Sikura purchased the 1978 thoroughbred filly Prinkipisa from the Bluegrass Farm *689 auction for $ 70,000. On July 29, 1979, Hill 'n' Dale transferred to ITBA all of its interest in and to Prinkipisa. On August 5, 1979, the Fowler Trust exchanged its interest in Main Saggy and Corniche for Prinkipisa plus five associated breeding rights. At the time of the sale of Bellenoble, Main Saggy, and Corniche to the Fowler Trust, Sikura and Malis intended that the Fowler Trust would have an 18-month right of exchange. There was no written exchange agreement between ITBA and Malis, as trustee for the Fowler Trust. At the time of the exchange of Main Saggy and Corniche for Prinkipisa, the parties believed that the fair market values of the interests exchanged were approximately equal. By check dated December 28, 1979, Malis, on behalf of Fowler, transferred $ 43,750 from the Malis Client Trust Account to ITBA, representing the cash down payment on the purchase of the 20-percent interest in the thoroughbred mares and the breeding rights. At that same time, Malis also delivered to ITBA a promissory note signed by Fowler and dated January 11, 1979, in the principal amount of $ 191,250. This note was payable interest only at the rate of 10 percent per annum, with the principal *690 due in full by January 11, 1985. During the years in issue, Fowler paid the following amounts as interest on the promissory note to ITBA: Year
Amount
1979
0    1980
$ 19,125.00
1981
19,125.00
1982
14,343.75
On June 23, 1981, Hill 'n' Dale transferred to ITBA all of its interest in and to the thoroughbred mare Calvinia, foaled in 1970. On January 19, 1982, the Fowler Trust exchanged its interest in Prinkipisa for Calvinia and five associated breeding rights. The exchange was not made pursuant to the 18-month right of exchange. At the time of the exchange, both Malis and Sikura believed that the interests exchanged had approximately equivalent fair market values. At all times from 1979 through September 1982, Corniche, Main Saggy, Bellenoble, Prinkipisa, and Calvinia and their foals were located at Hill 'n' Dale, Gormley, Ontario, Canada. Malis, as trustee of the Fowler Trust, appointed Sikura as attorney-in-fact to exercise all powers in connection with the thoroughbred mares. During the years in issue, Fowler paid the following amounts as board and care for the thoroughbred mares and their foals: Year
Amount
Payee
1979
$ 7,500
Hill 'n' Dale
1980
5,625
Hill 'n' Dale
1,875
Graymette, Ltd.
1981
7,500
Graymette, Ltd.
1982
5,625
Graymette, Ltd.
*691 During the 1980 breeding season, Bellenoble was bred to the stallion Blushing Groom. ITBA obtained the breeding season from Sikura. Sikura purchased this breeding season in October 1979 for $ 30,000. As a result of this breeding, Bellenoble produced a live foal in 1981. During the 1981 breeding season, Bellenoble was bred to the stallion Lyphard's Wish. ITBA obtained this breeding season from Sikura. Sikura paid approximately $ 30,000 for the breeding nomination. As a result of this breeding, Bellenoble produced a live foal in 1982. During the 1982 breeding season, Bellenoble was bred to the stallion Sassafras. ITBA obtained the nomination from Sikura. Sassafras' advertised 1982 stud fee was $ 25,000. During the 1982 breeding season, Calvinia was bred to the stallion Balzac, owned by Sikura. Sikura had purchased Balzac for $ 3.1 million. Balzac's 1982 stud fee was approximately $ 25,000. Prior to September 7, 1982, the Fowler Trust owned (i) a 20-percent interest in the thoroughbred mares Bellenoble and Calvinia, (ii) a 20 percent interest in the 1981 foal by Blushing Groom/Bellenoble, (iii) a 20 percent interest in the 1982 foal by Lyphard's Wish/Bellenoble, and *692 (iv) a 20 percent interest in six breeding nominations. Pursuant to an agreement and bill of sale dated September 7, 1982, the Fowler Trust agreed to sell its interest in the thoroughbred horses and their progeny to Hill 'n' Dale for $ 255,000. Under the terms of the agreement and bill of sale between Hill 'n' Dale and the Fowler Trust, the purchase price of $ 255,000 was payable $ 25,000 in cash and a promissory note in the principal amount of $ 230,000. The promissory note was payable interest only at the rate of 8.5 percent per annum, with the principal due September 7, 1992. Pursuant to an agreement between Malis, as trustee, and Hill 'n' Dale, the parties agreed to allocate the $ 255,000 purchase price as follows: Thoroughbred mares
$  60,000
Offspring
40,000
Remaining breeding rights
155,000
Total
$ 255,000
Malis, as trustee, and Hill 'n' Dale also agreed to a contingent readjustment of the purchase price should the thoroughbred mare or either of her first two foals at anytime win a graded stakes race. For each such win, the purchase price was to be increased as follows: Graded Race
Price Increase
1
$ 100,000
2
75,000
3
50,000
*693 In order to obtain the release of ITBA's purchase money lien on the thoroughbred horses and remaining breeding nominations, Fowler agreed to increase the principal balance of his $ 230,000 note due September 7, 1992, by 10 percent. This additional 10 percent, or $ 23,000, had not been paid at the time of trial in 1989. By check dated November 2, 1982, Hill 'n' Dale paid $ 25,000 to Malis, as trustee, as the initial payment on the purchase of Fowler's interest in the thoroughbred mares and the remaining breeding rights. Hill 'n' Dale paid the balance of the sales price by promissory note in the principal amount of $ 230,000. The note bore interest at 8.5 percent per annum and was payable interest only, with the principal due September 7, 1992. In December 1982, Sikura resold Calvinia to an unrelated third party for $ 250,000. Fowler reported the sale on the installment basis and recognized a gain of $ 17,975 in 1982. Of this amount, Fowler reported $ 7,010 as ordinary income and $ 10,965 as long-term capital gain. The Fowler Trust is taxable as a grantor trust. The Fowler Trust timely filed Fiduciary Income Tax Returns for the years in issue using the accrual method of *694 accounting. Fowler reflected the income and deductions of the Fowler Trust on his joint income tax returns for the years in issue. Fowler deducted losses from the grantor trust of $ 85,833, $ 65,792, $ 56,000, and $ 48,501 on his joint income tax returns for 1979, 1980, 1981, and 1982, respectively. Respondent disallowed these losses in full because Fowler failed to establish (1) that the transaction was entered into for profit, (2) that the transaction was other than a tax-avoidance device, (3) that the transaction had any business purpose or economic reality, (4) that the grantor trust was engaged in a trade or business, and (5) that any expense for which a deduction was claimed was paid or incurred for the purpose claimed. Respondent determined additions to tax for each of the years in issue as set forth above. Respondent also determined that Fowler was not entitled to report gain on the sale of the thoroughbred horses in 1982 on the installment basis and included the entire sales proceeds as ordinary income. Uversa Thoroughbreds, 1981, Ltd.
Petitioner Uversa Thoroughbreds, 1981, Ltd. (Uversa) is a limited partnership formed under the New Hampshire Uniform Limited *695 Partnership Act. Uversa adopted the accrual method of accounting and reported its income on a calendar year basis. Petitioner Uversa, Ltd., Inc. (Uversa, Inc.) is a New Hampshire corporation incorporated on December 10, 1981. Uversa, Inc. is the sole general partner of Uversa and owns a 0.82 percent interest in the capital profits and losses of Uversa. The remaining units of partnership interest in Uversa are owned by limited partners. During the years in issue, Malisos was the president of Uversa, Inc. During the period 1982 through 1984, Uversa, Inc. was also the general partner of the following New Hampshire partnerships: Fairbourne, Ltd.; Amesbury Thoroughbreds, Ltd.; Ashley Thoroughbreds Ltd.; Bredwin Thoroughbreds, Ltd.; Westchester Thoroughbreds, Ltd.; and Western Thoroughbreds, Ltd. These partnerships were engaged in horse breeding and leasing transactions during the period 1982 through 1984. Each partnership, with the exception of Western Thoroughbreds, Ltd., undertook transactions with Hill 'n' Dale. Pursuant to a private placement memorandum dated December 11, 1981, Uversa offered for sale 350 units of partnership interest at $ 5,000 each, for a total of $ 1,750,000, *696 plus the assumption of certain liabilities on a pro rata basis. The minimum purchase was 10 units, or $ 50,000, unless otherwise agreed to by the general partners. Unless all 350 partnership units were sold by a specified closing date, the offering was to be terminated and all subscription funds, promissory notes, assumptions of liabilities, and related documents were to be returned promptly without interest or deduction. The capital contribution of each subscribing limited partner of Uversa was to be: i. cash upon subscription of $ 1,500 per unit (the initial cash contribution); ii. execution and delivery of a full recourse promissory note in favor of the partnership, due and payable half on January 31, 1982, and the balance on January 31, 1983, in an amount equal to $ 3,500 per unit (the initial note capital contribution); and iii. execution of an assumption of liabilities whereby the subscribing limited partner assumed primary liability for a pro rata share of the deferred portion of the annual rent incurred in 1981 under a lease, as well as all deferred portions of the annual rents incurred for subsequent years, up to a maximum of 110 percent of the limited partner's *697 initial capital contributions. Pursuant to the private placement memorandum, the limited partnership units were also subject to mandatory assessments of additional capital contributions, the total of which could not exceed 10 percent per unit, or $ 500. An assessment could be made at the discretion of the general partner, but in no event could payment be required before June 15, 1982, or after June 15, 1984. Attached as Exhibit A to the private placement memorandum of Uversa was a 33-page opinion of Meserve, Mumper & Hughes, attorneys, with respect to the Federal income tax consequences incident to the formation and proposed operations of Uversa. The tax opinion noted that: The Internal Revenue Service has adopted a "Tax Shelter Program" to identify and examine "abusive tax shelter returns."  * * * * * *  "An 'abusive' tax shelter may be generally described as a transaction without any significant economic purpose other than the generation of tax benefits that typically employs exaggerated valuations and otherwise mischaracterizes critical aspects of the transaction." In the present case, the Partnership proposes to pursue the economic purpose of raising horses. It anticipates *698 a profit from such activity without regard to tax consequences. The Partnership has a significant economic purpose other than the generation of tax benefits. It is therefore unlikely that the Partnership would be considered an abusive tax shelter. Nevertheless, the Service's activity and vigilance in this area may increase the likelihood that a partner in the Partnership will be subject to audit. In June 1981, Sikura, on behalf of Hill 'n' Dale, and Malisos, on behalf of Uversa, began negotiating the lease of thoroughbred broodmares. Malisos reviewed the pedigrees and sales auction data on approximately 35 broodmares. Malis was indirectly involved in the partnership's leasing transactions that subsequently occurred, and he recommended the leasing investments to certain of his clients. Malisos, however, made the final decisions on behalf of Uversa on which horses to lease. On December 28, 1981, Uversa leased eight thoroughbred broodmares in foal from Hill 'n' Dale as lessor. At the execution of this lease (the Uversa Lease), Uversa incurred liability for an aggregate annual rental of $ 2,076,997 for the first year of the lease. Thereafter, on each of the next five anniversary *699 dates of the execution of the Uversa Lease, Uversa was liable for an annual rent in the sum of $ 1,038,500. As additional rent, Uversa agreed to pay to the lessor, Hill 'n' Dale, 35 percent of the gross receipts from the sale of any foal produced by a leased broodmare in excess of an amount set forth in the Uversa Lease. Under the Uversa Lease, the liability for annual rent not yet incurred could be avoided by the surrender by Uversa of all of its rights to any or all of the broodmares within the 30-day period immediately prior to any anniversary date of the execution of the lease. In the event of surrender of its rights, Uversa was to be the owner of any foal then in utero of the surrendered (or returned) broodmare. Hill 'n' Dale had no option to repurchase the foals. The Uversa Lease allowed Uversa to elect to defer a portion of the actual payment of the liability incurred for rent for the first 3 years of the Uversa Lease. Under this election, Uversa was required to pay $ 415,400 (20 percent of the first year's rent) in cash on execution of the lease. Payment of the balance of the first year's annual rent, as well as the entire second and third year's rent, could also be deferred. *700 Deferred amounts in each case bore simple interest at the rate of 9 percent per annum and were payable $ 350,000 on March 1, 1982, and $ 420,000 on March 1, 1983. In addition, Uversa was required to pay the lessor 75 percent of the gross receipts from the sale or financing of any foals born in 1982 and 40 percent of such gross receipts from foals born in 1983 and thereafter. Any unpaid deferred amounts were due and payable on December 31, 1989. As a condition to deferral, the Uversa Lease required that each limited partner execute an Assumption of Liabilities whereby the limited partner assumed personal liability to pay that partner's pro rata share of the deferred liability. Under the Uversa Lease, Hill 'n' Dale, as lessor, represented and warranted the broodmares to be in foal. All foals born to the broodmares during the terms of the lease, and any conceived by a broodmare while under lease, became the property of Uversa. The Uversa Lease contained no guarantee of a live, healthy foal; all risk of loss of the foals was in Uversa. The lessor retained the risk of loss of the broodmares and, in the event that a broodmare should die, the lessor was required to replace the broodmare *701 with one or more broodmares with an aggregate value comparable to that of the broodmare to be replaced. Under the terms of the Uversa Lease, Hill 'n' Dale, as lessor, agreed to breed each of the broodmares that had not been surrendered during the term of the lease to a stallion whose syndicated value or whose per cover basis represented a present worth of not less than an amount specified in the lease. Uversa agreed to deliver possession of the broodmares during the breeding season to the lessor solely for breeding. Hill 'n' Dale, as lessor, agreed that all expenses of such breeding, including stud fees, feed, water, shelter, and veterinary care incurred while the broodmares were in the possession of the lessor for breeding, would be borne by the lessor. Upon the completion of the breeding, the lessor was obligated to return possession of the broodmares to Uversa. The broodmares that were the subject of the Uversa Lease, the annual rents, and the general partner's estimated value of the 1982 foals as yearlings were represented in the Uversa Lease as follows: 1981
1982-1986
Estimated Value
Broodmare
Annual Rent
Annual Rent
of 1982 Foals
Tertiary
$   919,703
$   459,852
$   600,000
Oktaha
268,246
134,123
175,000
Sopapillo
191,606
95,803
125,000
Lucinda Light
153,284
76,642
100,000
Commercial Break
153,284
76,642
100,000
Chelseanna
153,284
76,642
100,000
Saiko Hour
122,627
61,314
80,000
Cornische
114,963
57,482
75,000
Total
$ 2,076,997
$ 1,038,500
$ 1,355,000
*702 Because the broodmares were initially acquired in foal, Uversa had the opportunity to obtain two foals from each mare during the first year of the lease and one foal per mare for each year thereafter. Of the eight broodmares leased to Uversa in December 1981, Sikura purchased five of the horses, already in foal, at the November 1981 Keeneland sale as follows: Broodmare
Auction Price
Tertiary
$ 830,000
Oktaha
225,000
Sopapillo
105,000
Lucinda Light
110,000
Commercial Break
70,000
During the years in issue, the leased broodmares and their foals were at all times boarded and maintained at Hill 'n' Dale. Pursuant to a management agreement with Turnabuck Management, Inc. (Turnabuck), Uversa agreed to pay a monthly fee of $ 2,000 plus $ 15 per day for each broodmare and foal for the maintenance and care of the broodmares and any foals they produced. Uversa was also required to reimburse Turnabuck for the actual costs of feed, food supplements, equipment and supplies, veterinary services, farrier services, and other similar expenses. During the years in issue, Andrew Malis, the father of Malis and Malisos, was president of Turnabuck. *703 During the 1982 foaling season, from January through June, four of Uversa's broodmares, Tertiary, Oktaha, Sopapillo, and Lucinda Light, aborted their foals. This was caused by a bad batch of virus vaccine given to the broodmares by Hill 'n' Dale. The aborted foals of Oktaha, Sopapillo, and Lucinda Light were replaced by the foal Siloel. The aborted foal of Tertiary was not replaced. Although the Uversa lease did not require the aborted foals to be replaced, Hill 'n' Dale agreed to replace the foals to avoid a dispute and to continue good business relations. During the 1982 breeding season, Tertiary was bred to the stallion Green Dancer. This breeding nomination was provided by Hill 'n' Dale. Uversa's remaining seven leased broodmares, Oktaha, Sopapillo, Lucinda Light, Commercial Break, Chelseanna, Saiko Hour, and Corniche, were also bred during the 1982 breeding season. All of these breeding nominations were also provided by Hill 'n' Dale. By letter dated December 23, 1982, Uversa agreed to continue the lease with respect to Tertiary, then in foal to Green Dancer, and to lease the thoroughbred broodmare Golden Alibi, then in foal to Nijinsky II. The other previously leased *704 broodmares were surrendered in accordance with the lease provisions. Under the Uversa Lease, total annual rent for 1982 was $ 1,038,500. In connection with the renewal of the lease with respect to Tertiary, Uversa accrued a liability of $ 459,852 for rent. Uversa agreed to accept the broodmare Golden Alibi in place of the previously leased broodmares, except Tertiary. Accordingly, Uversa accrued an additional liability of $ 578,648 for Golden Alibi. As further consideration for the leasehold interest in Golden Alibi, Uversa agreed to surrender to Hill 'n' Dale its interest in the unborn 1983 foals of the surrendered broodmares Oktaha, Sopapillo, Lucinda Light, Commercial Break, Chelseanna, Saiko Hour, and Corniche. During the 1983 breeding season, both Tertiary and Golden Alibi were bred to the stallion Riverman. These breeding nominations were provided by Hill 'n' Dale. Effective December 29, 1983, Uversa canceled the lease with respect to Golden Alibi. In connection with the cancelation, Hill 'n' Dale agreed to pay Uversa a bonus of $ 150,000 payable in four annual installments of $ 37,500 commencing December 31, 1984. Pursuant to the lease cancelation, Uversa surrendered *705 Golden Alibi, then in foal to Riverman, but retained its right to the foal then in utero. The following table sets forth all foals born to the leased broodmares and their subsequent disposition: Broodmare
Foals Disposition Sales Price
Tertiary
1982 foal
deceased, 1982
--    1983 foal
sold,     7/83
$ 600,000
Oktaha
1982 foal
deceased, 1982
--    Sopapillo
1982 foal
deceased, 1982
--    Lucinda Light
1982 foal
deceased, 1982
--    replacement foal
Siloel
sold,      -- 410,161
Commercial Break
1982 foal
sold,     9/83
40,610
Chelseanna
1982 foal
sold,     9/83
28,427
Saiko Hour
1982 foal
sold,     9/83
18,631
Corniche
1982 foal
sold,     9/83
12,183
Golden Alibi
1983 foal
sold,     7/83
600,000
1984 foal
sold,     5/84
500,000
In September 1983, Uversa sold the 1982 foals out of Commercial Break, Chelseanna, Saiko Hour, and Corniche at public auction. Uversa also sold the replacement foal Siloel at public auction to Westchester Thoroughbreds, Ltd. (Westchester) for $ 410,161. Westchester is a thoroughbred horse partnership *706 involved in leasing activities with Hill 'n' Dale. Uversa, Inc. is the general partner of Westchester. The sales price for Siloel was paid 20 percent in cash and the balance in promissory notes. Pursuant to an agreement and bill of sale dated July 1, 1983, Uversa agreed to sell to Hill 'n' Dale the 1983 foal out of Tertiary and the 1983 foal out of Golden Alibi for a total sales price of $ 1,200,000. The sales price was payable $ 240,000 in cash with the balance represented by a promissory note in the principal amount of $ 960,000 bearing interest at 12 percent per annum. Under the terms of this note, accrued interest on the unpaid principal balance was to be paid annually on December 31, and the principal was to be paid in full on or before December 31, 1989. Uversa did not receive the $ 240,000 cash payment in 1983. Subsequently, Sikura sold these two foals to an unrelated party. Pursuant to an agreement and bill of sale dated May 31, 1984, Uversa agreed to sell to Hill 'n' Dale the 1984 foal out of Golden Alibi for a total sales price of $ 500,000, payable by promissory note bearing interest at 10 percent per annum. By the terms of this note, accrued interest on the unpaid *707 principal balance was to be paid annually on December 31, and the principal was to be paid in four annual installments of $ 125,000 commencing January 1, 1986. Uversa made the following cash payments under the lease with Hill 'n' Dale: Date
Amount
12/29/81
$ 200,000
12/30/81
215,400
03/01/82
350,000
02/14/83
420,000
02/28/84
223,353
02/25/85
270,000
03/10/86
270,000
Uversa's payments on February 25, 1985, and March 10, 1986, were made prior to their due dates. In consideration of these early payments, Hill 'n' Dale agreed to reduce the amounts owed by $ 38,571 for each payment. Uversa filed Forms 1065, U.S. Partnership Return of Income, for 1981 through 1984. Uversa claimed deductions for accrued rental expense for the leased broodmares of $ 2,076,997, $ 1,038,500, and $ 459,852 for 1981, 1982, and 1983, respectively. Uversa reported net losses of $ 2,083,384, $ 1,154,490, and $ 387,608 for 1981 through 1983, respectively. On its final partnership return for the year ended December 31, 1984, Uversa did not deduct any lease expenses but reported under "other liabilities" a $ 2,389,949 lease payable accrued from 1981, 1982, and 1983. *708 Uversa, Inc. Uversa, Inc. uses the cash receipts and disbursements method of accounting and reports its income on the basis of a fiscal year ending November 30. Uversa, Inc. reported its share of income and losses from Uversa as follows: 1981
( $ 17,084 )
1982
(9,466 )
1983
(3,178 )
1984
608   ordinary income
1,968   short term capital gain
As the general partner of several limited partnerships, Uversa, Inc. received initial management fees of 10 percent of the cash contributed by limited partners. Of this 10 percent management fee, Uversa, Inc. was entitled to pay up to 8 percent as finders' fees in connection with the sale of limited partnership interests. In addition to the initial management fee, Uversa, Inc. received a $ 3,000 per month allowance from Uversa. Uversa, Inc. also received similar compensation for acting as the general partner of various other limited partnerships. Uversa, Inc. paid $ 26,000 and $ 104,745 as finders' fees during its fiscal years ended November 30, 1982, and November 30, 1983, respectively. During fiscal years 1982 and 1983, Uversa, Inc. also paid $ 15,329 and $ 62,945, respectively, *709 as fees to attorneys and accountants for professional services. In a statutory notice of deficiency, respondent disallowed Uversa, Inc.'s claimed deductions for finders' fees and attorneys fees. On May 28, 1982, Uversa, Inc. entered into a contract/bill of sale with G. James Sacco, agent for Malis, for the purchase of four thoroughbred horses, Gold Futures, Dr. Shean, Purple Pie, and an unnamed weanling by Pledge Allegiance/Gold Futures. The total purchase price was $ 95,000, payable $ 25,000 in cash and the balance of $70,000 due on or before March 1, 1983. Uversa, Inc. paid the $ 25,000 down payment by check dated June 7, 1982, payable to G. James Sacco. Uversa, Inc. allocated $ 50,000 of the purchase price to Gold Futures, a broodmare born in 1970, and $ 20,000 to Purple Pie, a race filly born in 1978, and claimed deductions for depreciation. Respondent disallowed Uversa, Inc.'s claimed depreciation deductions for the years in issue. Uversa, Inc. received payments totaling $ 800,655 during fiscal year 1983 for its services as general partner of the various limited partnerships. On its corporate income tax returns for fiscal years 1982 and 1983, Uversa, Inc. reported gross *710 receipts of $ 149,750 and $ 753,685, respectively. Respondent determined that Uversa, Inc. failed to report gross receipts of $ 49,662 for its year ended November 30, 1982. On its corporate tax return for the fiscal year ended November 30, 1982, Uversa, Inc. claimed deductions of $ 27,752 and $ 78,880, respectively, for depreciation and business expenses. Respondent disallowed these deductions in full. On its corporate tax return for the fiscal year ended November 30, 1983, Uversa, Inc. claimed deductions of $ 62,251 and $ 624,967, respectively, for depreciation and business expenses. Respondent disallowed the depreciation deduction in full and disallowed various other business deductions to the extent of $ 259,155. Pursuant to a purchase and exchange offer dated August 22, 1984, Uversa, Inc. offered Uversa's limited partners the following in exchange for their interests in the partnership: i. $ 1,715 per unit, payable one half by October 31, 1984, and the balance by January 31, 1985; ii. a promissory note in the amount of $ 4,750 per unit, payable in seven annual installments commencing January 1, 1985, with interest accruing on the unpaid balance at the rate of 10 *711 percent per annum, which note was to be held in escrow to provide for repayment of liabilities of the partners owed to Hill 'n' Dale on the accrued lease payments; and iii. 37.75 shares of Uversa, Inc. stock per partnership unit to be issued to the partners on January 31, 1985. All of Uversa's limited partners accepted Uversa, Inc.'s purchase and exchange offer in 1984. Accordingly, all of Uversa's limited partnership interests were transferred to Uversa, Inc. As a result, the former limited partners no longer own any interest in Uversa. Jasmine Associates, Ltd. Jasmine Associates, Ltd. (Jasmine) is a limited partnership formed under the California Uniform Limited Partnership Act. Jasmine adopted the accrual method of accounting and reported its income on a calendar year basis. Nesmine Development, Inc. (Nesmine), a California corporation, is the sole general partner and the tax matters partner of Jasmine. During the years in issue, Malisos was president of Nesmine. Jasmine was originally formed in 1981 to engage in the business of acquiring certain oil and gas properties in Kern County, California, and drilling and operating wells thereon. Such operations proved *712 unsuccessful, and Jasmine abandoned these prospects. The proposed change in business operations of Jasmine was described to the partners in a document dated December 15, 1982, titled "Summary of Proposed Change of Business Operations." Attached as an exhibit to this document was a 30-page opinion of Meserve, Mumper & Hughes, attorneys, with respect to the Federal income tax consequences incident to the proposed operations of Jasmine. This opinion contained a detailed statement of relevant facts and authorities and expressly stated that the attorneys considered it "more likely than not" that the courts would ultimately sustain the tax position indicated. On December 22, 1982, Jasmine's partners executed an Amendment to Agreement of Limited Partnership to reflect the change in the character of its business and to change the location of its principal place of business to Arcadia, California. All of the partners consented to these changes. Pursuant to a lease dated December 28, 1982, Jasmine leased five thoroughbred broodmares, then in foal, from Hill 'n' Dale as lessor. Prior to entering into this lease, Malisos reviewed the pedigrees of approximately 30 broodmares. Malisos made *713 the final decisions on behalf of Jasmine on which horses to lease. At the execution of this lease (the Jasmine Lease), Jasmine incurred liability for an aggregate annual rental of $ 1,000,000 for the first year of the lease. Thereafter, on each of the next five anniversary dates of the execution of the Jasmine Lease, Jasmine was liable for an annual rent of $ 500,000. Under the Jasmine Lease, the liability for annual rent not yet incurred could be avoided by the surrender by Jasmine of all of its rights to any or all of the broodmares within the 30-day period immediately prior to any anniversary date of the execution of the lease. In the event of surrender of its rights, Jasmine was to be the owner of any foal then in utero of the surrendered (or returned) broodmare. Hill 'n' Dale had no option to repurchase the foals. The Jasmine Lease allowed Jasmine to elect to defer a portion of the actual payment of the liability incurred for rent for the first 3 years of the Jasmine Lease. Under this election, Jasmine was required to pay $ 500,000 in cash on execution of the Jasmine Lease. Payment of the balance of the first year's annual rent, as well as the entire second and third years' *714 rent, could be deferred, and it was deemed deferred if no payment was made. Any unpaid deferred amounts were due and payable on December 31, 1990. As a condition to deferral, the lease required that each of Jasmine's limited partners execute an Assumption of Liabilities whereunder the partner agreed to assume personal liability to pay that partner's pro rata share of the deferred liability. Deferred amounts bore simple interest at the rate of 9 percent per annum and were payable $ 350,000 on March 1, 1983, and $ 420,000 on March 1, 1984. In addition, Jasmine was required to pay on the deferred amount 75 percent of the gross receipts from the sale of any foals born in 1983 and 40 percent of such gross receipts from foals in 1984 and thereafter. Any unpaid deferred amounts were due and payable on December 31, 1987. Under the terms of the Jasmine Lease, Hill 'n' Dale, as lessor, agreed to breed each of the broodmares that had not been surrendered during the term of the lease to a stallion whose syndicated value or whose per cover basis represented a present worth of not less than an amount as specified in the lease. Jasmine agreed to deliver possession of the broodmares during *715 the breeding season to the lessor solely for this purpose. Hill 'n' Dale, as lessor, agreed that all expenses of such breeding, including stud fees, feed, water, shelter, and veterinary care incurred while the broodmares were in the possession of the lessor for breeding, would be borne by the lessor. Upon the completion of the breeding, the lessor was obligated to return possession of the broodmares to Jasmine. Under the lease, Hill 'n' Dale represented and warranted the broodmares to be in foal. All foals born to the broodmares during the term of the lease, and any foals conceived by a broodmare while under lease, became Jasmine's property. The lease contained no guarantee of a live, healthy foal, and all risk of loss of the foals was on Jasmine. Hill 'n' Dale retained the risk of loss of the broodmares and, in the event a broodmare should die, Hill 'n' Dale was required to replace the mare with one or more mares with an aggregate value comparable to that of the mare lost. The broodmares that were the subject of the Jasmine Lease, the annual rents, and the general partner's estimated value of the 1983 foals as yearlings were represented in the Jasmine Lease as follows: 1982
1983-1987
Estimated Value
Broodmare
Annual Rent
Annual Rent
of 1983 Foals
Bellenoble
$   138,000 $  69,000 $ 100,000   Binky
207,000 103,500 150,000   Susie Bigger
173,000 86,500 125,000   Think Music
138,000 69,000 100,000   Well-in-Hand
344,000 172,000 250,000   Totals
$ 1,000,000 $ 500,000 $ 725,000   *716 Because the broodmares were initially acquired in foal, Jasmine had the opportunity to obtain two foals from each mare during the first year of the lease and one foal per mare for each year thereafter. Of the five broodmares leased to Uversa in December 1981, Sikura purchased three of the horses, already in foal, at public auctions in October or November 1981 as follows: Broodmare
Auction Price
Susie Bigger
$ 102,125
Think Music
77,000
Well-in-Hand
95,000
During the years in issue, the leased broodmares and their foals were at all times boarded and maintained at Hill 'n' Dale. Pursuant to a management agreement dated December 23, 1982, with Thoroughbred Services, Inc. (Thoroughbred Services), Jasmine agreed to pay a monthly fee of $ 1,500 plus $ 25 per day for each broodmare and $ 15 per day for each foal for the maintenance and care of the broodmares and any foals they produced. Jasmine was also required to reimburse Thoroughbred Services for the actual costs of feed, food supplements, equipment and supplies, veterinary services, farrier services, and other similar expenses. During the years in issue, Andrew Malis, the father of *717 Malis and Malisos, was president of Thoroughbred Services. This agreement never took effect, and Jasmine did not incur or deduct any expenses in connection therewith. In December 1982, Malisos, on behalf of Jasmine, and Sikura, on behalf of Hill 'n' Dale, reached an agreement whereby Hill 'n' Dale agreed to provide board and care for the leased broodmares and their foals, as well as insurance on the foals, during the term of the lease for an advance payment of $ 100,000. Jasmine paid the $ 100,000 fee to Hill 'n' Dale by check dated December 23, 1982. During the 1983 foaling season, Jasmine's leased broodmares Bellenoble, Binky, and Think Music produced foals; the mare Well-in-Hand and her foal died during foaling; and the mare Susie Bigger produced twin foals, a colt and a filly. Twins are undesirable in thoroughbred foals; Jasmine contributed the twin colt to an orphanage. During the 1983 breeding season, the remaining four leased broodmares were bred to stallions. Effective November 1, 1983, Jasmine canceled the lease with respect to Think Music. In connection with the cancelation, Hill 'n' Dale agreed to pay Jasmine a bonus of $ 10,000 payable in four annual installments *718 of $ 2,500 commencing December 31, 1984. Hill 'n' Dale also agreed to pay Jasmine the sum of $ 85,000 for Think Music's 1984 foal, then in utero, payable in equal annual installments of $ 21,250 commencing December 31, 1984, with interest at 12 percent per annum. Effective December 1, 1983, Hill 'n' Dale agreed to replace the broodmare Well-in-Hand, who had died, with the broodmare Turnablade. Turnablade was previously owned by the Malis Grantor Trust and was sold to Hill 'n' Dale, together with breeding rights, in 1982. Effective January 5, 1984, Turnablade was replaced by an unnamed broodmare ex foal 1985 (without her 1985 foal), which unnamed broodmare was to be designated by Jasmine on or before April 30, 1985. Subsequently, the broodmare Barb's Bold was designated as the replacement for Turnablade. Effective December 29, 1983, Jasmine canceled the lease with respect to Bellenoble, Binky, and Susie Bigger. In connection with the cancelation, Hill 'n' Dale agreed to pay Jasmine a bonus of $ 75,000 payable in four annual installments of $ 18,750 commencing December 31, 1984. Hill 'n' Dale also agreed to pay Jasmine the sum of $ 320,000 for the 1983 standing foals and the *719 1984 in utero foals of Bellenoble, Binky, and Susie Bigger, payable in equal annual installments of $ 80,000 commencing December 31, 1984, with interest at 12 percent per annum. The following table sets forth all foals conceived or born to the leased broodmares and their subsequent disposition to Hill 'n' Dale: Broodmare
Foals
Disposition
Sales Price
Bellenoble
1983 foal
sold 12/83
1984 foal
sold 12/83
Binky
1983 foal
sold 12/83
1984 foal
sold 12/83
Susie Bigger
1983 foal
sold 12/83
1984 foal
sold 12/83
Total
$ 320,000
Think Music
1983 foal
sold 6/83
80,000
1984 foal
sold 11/83
85,000
Well-in-Hand
deceased, 1983
--
68,400 *
On its partnership tax returns for 1982 and 1983, Jasmine reported net losses of $ 727,674 and $ 329,089, respectively. Jasmine also claimed the following deductions: 1982
1983
Board and Care Expense
$  4,762
$ 30,900
Management Fee Expense
18,000
42,000
Professional Fees
--  3,568
Bank Expenses
518
--  Postage, etc.
143
--  Tax Return Preparation
1,640
--  Total
$ 25,063
$ 76,468
*720 Of the deductions claimed in 1982 and 1983, as set forth above, the amount deducted for board and care represents a proportionate amount of the $ 100,000 in cash previously paid to Hill 'n' Dale on December 23, 1982. The management fees were incurred pursuant to the management agreement with Thoroughbred Services, but the payment of these fees was deferred. As of the date of trial in 1989, such amount had not been paid. The amounts deducted for the remaining expenses were paid during the taxable years indicated above. On its 1983 partnership return, Jasmine elected to report on the installment basis the 1983 sale of the three standing 1983 foals born to the broodmares Bellenoble, Binky, and Susie Bigger, as well as the three 1984 foals still in utero of these same broodmares. Jasmine reported the amount realized from this sale as $ 320,000 for the foals and $ 75,000 for the lease cancelation bonus. Because Jasmine had not received any payment in the year of sale, it reported the taxable part of the installment sale for 1983 as zero. On its 1983 partnership return, Jasmine also elected to report on the installment basis the 1983 sale of the 1984 foal of Think Music, then in *721 utero. Jasmine reported the amount realized from this sale as $ 85,000 for the foal and $ 10,000 for the lease cancelation fee. Because Jasmine had not received any payment in the year of sale, it reported the taxable part of the installment sale for 1983 as zero. On its Federal tax returns for 1982 and 1983, Jasmine claimed deductions of $ 1,000,000 and $ 250,000, respectively, for accrued rental expense pertaining to the leased broodmares. Of the rent accrued, $ 500,000 was paid by check dated December 23, 1982. Jasmine did not deduct any further annual rent expenses in 1984 or subsequent years. At the time of trial, Jasmine's thoroughbred horse operations were essentially dormant. With respect to the balance of the accrued rental liability of $ 750,000, Jasmine and Hill 'n' Dale entered into a settlement agreement effective February 27, 1986. Pursuant to that agreement, Jasmine acknowledged that it was indebted to Hill 'n' Dale for lease obligations of $ 750,000, and Hill 'n' Dale acknowledged that it was indebted to Jasmine for the purchase of various horses for $ 570,000 plus accrued interest. Each party assigned to the other party their respective interests in these *722 debts in full satisfaction of their liability one to the other. Edward Steinbrecher
Petitioner Edward Steinbrecher (Steinbrecher) was an attorney specializing in personal injury law. After an inquiry into Malis' background, Steinbrecher and his law partner engaged Malis to provide a range of business, tax, and financial planning advice. Steinbrecher's law firm paid Malis a retainer of $ 1,500 per month for the period January 1981 through January 1986, and a retainer of $ 1,000 per month for the period February 1986 through January 1987. Malis' advice covered a panoply of subjects, including family tax planning, wills and trusts, pension and profit sharing, real estate investments, oil investments, and thoroughbred racing. Steinbrecher was familiar with Malis' background in tax matters and in the thoroughbred horse business. Pursuant to Malis' advice and recommendations, Steinbrecher invested in several real estate and oil drilling limited partnerships. When the oil drilling venture did not prove profitable, Steinbrecher accepted Malis' advice that the limited partnership invest the balance of its funds in the thoroughbred horse business. During the year ended December 31, 1982, Steinbrecher *723 was a partner in Jasmine and held a 10-percent interest in Jasmine's capital, profits, and losses. Steinbrecher contributed $ 79,375 to Jasmine. This amount was paid by two checks in the amounts of $ 59,375 and $ 20,000 dated December 21, 1981, and December 20, 1982, respectively. In signing Jasmine's subscription agreement, Steinbrecher represented that he was knowledgeable and experienced in business and financial matters, that he was capable of evaluating the risks and merits of his investment in the partnership, that he was capable of making an informed investment decision, and that he had not consulted with others in evaluating the investment. Steinbrecher also acquired a 10-percent interest in Ashley Thoroughbreds, Ltd. (Ashley Thoroughbreds), a New Hampshire limited partnership involved in thoroughbred leasing transactions with Hill 'n' Dale. Steinbrecher's reported distributive share of Jasmine's losses for 1982 was $ 72,767. In determining his taxable income for 1982, Steinbrecher deducted his distributive share of Jasmine's losses and deductions. In the statutory notice of deficiency in docket No. 37873-86, respondent disallowed Steinbrecher's loss deductions with *724 respect to Jasmine and with respect to Ashley Thoroughbreds. Respondent also imposed additions to tax under sections 6651(a)(1), 6653(a)(1), and 6653(a)(2). Respondent has now conceded that Steinbrecher is not liable for the addition to tax under section 6651(a)(1) for failing to file a timely tax return for 1982. Ashley Thoroughbreds is a partnership whose first taxable year began after September 3, 1982. Accordingly, items pertaining to Ashley Thoroughbreds are partnership items that are required to be determined at the partnership level under section 6621 et seq. This Court, therefore, is without jurisdiction to determine adjustments pertaining to Ashley Thoroughbreds in docket No. 37873-86. OPINION These consolidated cases serve as test cases for other investors in the thoroughbred breeding programs discussed above. Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a). Particularly with respect to deductions, they must bring themselves within the terms of the applicable statutes. *725 Rockwell v. Commissioner, 512 F.2d 882, 885-886 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. Grantor Trust Issues
Respondent argues that the transactions at issue were not bona fide sales for Federal income tax purposes in that the Winans and Fowler grantor trusts never acquired the benefits and burdens of ownership of the thoroughbred horses and breeding nominations. Respondent also contends that the thoroughbred horse activities were shams in that they were not undertaken with the objective of profit, the transactions lacked business purpose, and petitioners entered the transactions solely to obtain tax benefits. Alternatively, respondent argues that the losses incurred by Winans and Fowler are limited by the at risk provisions of section 465. We cannot agree with respondent's assertion that the transactions between petitioners and Sikura were entirely lacking in economic substance or business purpose or were shams. As we stated at the conclusion of trial, these cases involve real horses with real values, and the values of the horses were a substantial part of the purchase price. Our review of the evidence and the briefs reinforces *726 our opinion that the transactions were motivated by business purpose and supported by economic substance. ITBA's Role in the Transactions
We agree with respondent's argument that ITBA served no valid economic or business purposes in the transactions other than for tax purposes and must be ignored. In other instances we have considered whether an entity interjected into a transaction was placed in the transaction as a "strawman." We have disregarded such entities in those instances where there was no genuine suggestion of any business purpose for the entity's insertion in the transaction. Bussing v. Commissioner, 88 T.C. 449, 457 (1987), supplement opinion 89 T.C. 1050 (1987); Tolwinsky v. Commissioner, 86 T.C. 1009, 1037 (1986); Packard v. Commissioner, 85 T.C. 397, 421-422 (1985). In view of all the evidence, we do not believe that ITBA's participation served any valid business purpose. Petitioners argue that ITBA was under common control of Sikura and Simonian, another foreign national. Simonian did not testify at trial, and respondent was apparently never able to locate him. The only reason given *727 by any witness for ITBA's formation was Sikura's statement that it was to avoid Canadian withholding tax. Malis was particularly evasive about ITBA. Petitioners do not dispute that Sikura had sole discretion over the thoroughbred horse transactions. Sikura owned all of the horses supplied to ITBA and provided all the breeding nominations. We conclude that ITBA's insertion into the thoroughbred transactions was merely "window dressing" solely to create the appearance of multiple-party transactions. Consequently, we disregard ITBA's presence in the instant transactions. In substance, therefore, Winans and Fowler purchased the thoroughbreds and breeding nominations directly from Sikura. Subsequently, Winans and Fowler resold their interests in the thoroughbred mares, their offspring, and the remaining breeding rights back to Sikura. ITBA neither added value nor performed a necessary part of the transactions. Fair Market Value
Because the fair market value of the horses in relation to the purchase price influences our decision on various issues in these cases, we discuss that question before considering the alternative grounds for disregarding the form of the transactions. *728 Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973). Both petitioners' expert witness, Thomas M. Clark (Clark), and respondent's expert witnesses, Ben P. Walden, Sr. (Walden) and Don Engel (Engel), valued the thoroughbred horses and related breeding rights in issue. Because of fundamental differences in approach between the experts, particularly with respect to the value of future breeding nominations, the amounts arrived at in the valuations were extremely far apart. The following chart lists the different values of the thoroughbred mares and breeding nominations arrived at by petitioners' expert, Clark, and respondent's expert, Engel, as of January 11, 1979: Expert
Petitioners'
Sikura's
Petitioner/Asset
Clark
Engel
Cost
Cost
Winans Trust
Pagan Pagan
$ 225,000
$  60,000
--
$  16,500
Breeding rights
250,000
87,500
-- 105,000
Total
$ 475,000
$ 147,500
$ 825,000
$ 121,500
Fowler Trust
Main Saggy *
$  20,000
$   2,500
--
$  10,000
Corniche *
15,000
2,000
--
19,500
Bellenoble *
35,000
16,000
--
77,000
Breeding rights *
150,000
46,300
--
110,000
Total
$ 220,000
$  66,800
$ 235,000
$ 216,500
*729 The difference between the expert valuations in these cases demonstrates the caution that is necessary in weighing expert valuations that zealously attempt "to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise." Messing v. Commissioner, 48 T.C. 502, 512 (1967). We are not bound by the opinion of any expert witness. We may accept an expert's opinion or we may reject testimony that is contrary to our own judgment, especially where the witness' opinion of value is so exaggerated that the testimony is incredible. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). In the context of valuation cases, we have repeatedly observed that experts may lose their usefulness and credibility when they merely become advocates for the position argued by a party. See, e.g., Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We are not alone in our suffering from the excesses of expert testimony. In Mid-State Fertilizer Co. v. Exchange National Bank of Chicago, 693 F. Supp. 666, 670 (N.D. Ill. 1988), the District Court held that the affidavit of *730 an economist was insufficient because the economist "does not recite any of the specific facts or steps in his reasoning." The Court of Appeals for the Seventh Circuit affirmed, stating: Indeed, nothing in the affidavit draws on the skills of an economist. Insights into "good faith and fair dealing" are no part of the economist's armamentarium * * * Bryan offered the court his CV rather than his economic skills. Judges should not be buffaloed by unreasoned expert opinions. * * * [877 F.2d 1333, 1340 (7th Cir. 1989).] We keep these cautions in mind when weighing the expert testimony in these cases. Petitioners engaged Clark to value the thoroughbred horses and breeding nominations purchased by the grantor trusts. Clark, owner of Clark Thoroughbreds, Ltd., had been involved as a professional consultant and broker in the thoroughbred industry for 10 years and performed appraisals for major banks and insurance companies. Clark outlined the economic growth of the thoroughbred industry over the prior 20 years and set forth his evaluation methodology. Factors that Clark used to value the thoroughbred broodmares included pedigree or family history, race record, *731 physical conformation, and fertility or produce record. Clark believed that the value of a breeding nomination was a matter of statistical record. Accordingly, Clark valued the thoroughbred breeding rights at issue by referring to fees contained in the private newsletter, Racing Update. The breeding rights reported in Racing Update were priced on a live foal guarantee basis with payment deferred until the foal is born. The breeding rights that petitioners purchased, however, were on a no guarantee basis. In making his valuation of petitioners' investments, Clark did not adjust the prices taken from Racing Update to account for this difference. Clark, however, believed that a discount of 20 to 40 percent might be appropriate in discounting the price of a fully guaranteed breeding season to value a season with no guarantee. Respondent engaged Walden to analyze the thoroughbred transactions as they related to generally accepted standards in the thoroughbred horse industry. Petitioners objected to the admission into evidence of Walden's report on grounds including that a portion of the report consisted of impermissible argument on matters of law, and that the probative value *732 of the report was substantially outweighed by considerations of undue delay and waste of time. Because we agreed with petitioners, Walden's report, with the exception of the first five pages, was not admitted into evidence. Respondent also engaged Engel to appraise the thoroughbred horses and breeding rights at issue herein and prepare a report. Engel was the president, general manager and founder of Thoroughbred Information Agency, a California auction-sale agency that advises investors in thoroughbred racing and breeding stock. Engel's report consisted of three parts: (1) appraisal methodology and examination of the structure of the broodmare and breeding rights as business investment, (2) critical evaluations of the operations, and (3) appendices of supporting information and appraisals of the horses as of January 11, 1979. Part two of Engel's report contained a strongly argumentative and biased analysis of the thoroughbred investments. At trial, respondent withdrew this portion of Engel's report. Engel lacked the qualifications and experience of the other appraisers who testified. Petitioners' horses were physically located and bred in Kentucky and/or Canada. Engel's *733 business, however, was primarily located in California, and he conducted less than 10 percent of his business in Kentucky. Further, Engel had no access to private sales data in Kentucky and, therefore, relied solely on public auction data in making his appraisals. We conclude that Engel's opinion as to the values of the thoroughbred horses at issue herein should be accorded little weight. Engel was obviously interested in assigning a low value to the horses, and that bias reduces the persuasiveness of his testimony. We are persuaded that the methods used by petitioners' appraiser, Clark, are much more reliable than those used by respondent's appraisers and that the actual fair market values of the horses are closer to petitioners' valuation than respondent's. Accordingly, we conclude that the fair market values of the thoroughbred broodmares purchased by Winans and Fowler were $ 225,000 and $ 70,000, respectively, the appraised values provided by Clark. Although we have considered Sikura's costs of acquisition of the horses, the passage of time and rapidly changing values make this evidence less compelling here than in other cases. Sikura was also better positioned to obtain *734 breeding rights and more favorable prices than would be available to petitioners or to Malis dealing on their behalf. As noted above, however, Clark failed to discount the price of a fully guaranteed breeding season to value petitioners' breeding rights, which came with no guarantee. After considering the evidence, and in our best judgment, we conclude that the fair market values of the breeding rights purchased by Winans and Fowler were $ 175,000 and $ 105,000, the appraised values provided by Clark less a 30 percent discount. Benefits and Burdens of Ownership
Our next inquiry is whether a sale of the thoroughbred broodmares actually occurred. The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown, 380 U.S. 563, 570-571 (1965). The key to determining whether a sale occurred depends on whether the benefits and burdens of ownership passed from the seller to the buyer. This determination is a factual one based on all of the facts and circumstances. *735 Zirker v. Commissioner, 87 T.C. 970, 976 (1986); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981); Haggard v. Commissioner, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). Transactions similar to those at issue herein have been frequently analyzed by this Court on the basis of the following factors: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether the purported purchaser acquires any equity in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party bears the risk of loss or damage to the property; and (7) which party receives the profits from the sale of the property.
Cherin v. Commissioner, 89 T.C. 986, 996-997 (1987); Falsetti v. Commissioner, 85 T.C. 332, 348 (1985); *736 Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1237-1238; Estate of Franklin v. Commissioner, 64 T.C. 752, 763-770 (1975), affd. 544 F.2d 1045 (9th Cir. 1976); Harmston v. Commissioner, 61 T.C. 216, 228-231 (1973), affd. 528 F.2d 55 (9th Cir. 1976). An additional factor relevant to the facts of these cases is the presence or absence of arm's-length dealing. Falsetti v. Commissioner, supra; Estate of Franklin v. Commissioner, supra.
With respect to the first factor, legal title, the parties agree that the thoroughbred mares and their foals were registered with the Jockey Club under the names of Sikura/Hill 'n' Dale Farms. The parties also agree that a Jockey Club registration certificate is required to register a newborn foal, to race a thoroughbred, or to sell a thoroughbred at public auction. Respondent argues that the owner of a thoroughbred is assumed to be the person listed on the Jockey Club registration certificate. Respondent, therefore, contends that Sikura retained legal title to the thoroughbred horses. Petitioners argue, however, that *737 Jockey Club registration is relevant only for establishing the breeding of a horse. Further, petitioners argue that a bill of sale, not a registration certificate, controls the passage of legal title to a thoroughbred horse. In the instant cases, both Winans and Fowler received bills of sale sufficient to transfer formal legal title to the thoroughbreds. The weight of the evidence on this factor favors petitioners' position. Petitioners retained Richard W. Craigo (Craigo) to analyze certain customs regarding the transfer of ownership of thoroughbred horses in use in the thoroughbred horse industry during the years in issue. Craigo, an owner and breeder of thoroughbred horses in California and Kentucky, is an attorney specializing in equine law. Craigo testified generally as to the transactional informality that has become customary in the thoroughbred industry and specifically as to the use of Jockey Club registration certificates in the purchase and sale of thoroughbred horses. Craigo concluded that the primary document proving the transfer of title to a thoroughbred horse is a bill of sale and not the registration certificate. With respect to the second factor, respondent contends *738 that the parties did not treat the transactions as sales. Specifically, respondent argues that Winans and Fowler "blindly" relied on Malis, who handled both transactions and made all the decisions on their behalf. Respondent also characterizes the paperwork documenting the transactions as "sloppy." Petitioners contend that this characterization ignores the evidence that Sikura did business by a "handshake," as well as Craigo's expert testimony that there is an unusual degree of transactional informality in the thoroughbred industry. Petitioners also point out that the parties to the transactions documented the sales as well as the authority given to Malis and to Sikura. Further, petitioners contend that the parties complied with the terms of these various agreements. During the years in issue, both Winans and Fowler paid all interest and board payments required by their contracts, Sikura provided the necessary stallion breeding nominations each year, and Malis and Malisos oversaw the conduct of the transactions. Respondent also notes that, rather than taking legal action to collect on petitioners' notes, Sikura merely "repurchased" the horses. Respondent, however, ignores *739 the evidence that petitioners' originally undertook a 7-year investment. When this investment was cut short by respondent's investigation, Malis, as petitioners' agent, attempted to maximize sales proceeds by reselling all the horses and breeding rights as a package to Sikura. The weight of the evidence on this factor supports petitioners' position. With respect to the third factor, respondent argues that Winans and Fowler did not acquire an equity in the thoroughbred horses. Winans purchased Pagan Pagan and five breeding rights for $ 825,000. Winans made an initial cash payment of $ 175,000 and signed a promissory note for the balance of $ 650,000. Fowler purchased a 20 percent interest in Main Saggy/Corniche/Bellenoble and 15 breeding rights for $ 235,000. Fowler made an initial cash payment of $ 43,750 and signed a promissory note for the balance of $ 191,250. Respondent contends that the assets "purchased" were worth only a fraction of the stated purchase price and that the purchase price was inflated through the use of substantively nonrecourse debt to generate a higher depreciable basis. Further, respondent argues that, because Winans and Fowler were building no equity *740 in the assets, the purchases were illusory and there was no incentive for petitioners to fulfill their payment obligations under the promissory notes. Finally, respondent notes that neither Winans nor Fowler have made any principal payments under these promissory notes. The substantial cash investments by both Winans and Fowler support a finding that they acquired the benefits and burdens of ownership in the thoroughbreds. Winans invested cash of approximately 21 percent of the total purchase price. Likewise, Fowler invested cash of approximately 19 percent of the purchase price. Petitioners did purchase equity interests in the thoroughbred horses and breeding rights equal to their fair market values. Petitioners, therefore, had a real incentive to protect their investments. With respect to the fourth factor, respondent argues that neither petitioner had a present obligation to make payments pursuant to the promissory notes. Respondent points out that although petitioners failed to make principal payments on their notes, no legal action was instituted to collect the notes. Petitioners, however, made the required interest payments during the years in issue. Subsequently, the *741 parties to the transactions agreed on a moratorium on payment of the notes pending the outcome of the IRS challenge to the thoroughbred transactions. The weight of the evidence on this factor favors petitioners' position. With respect to the fifth factor, the right of possession, the parties stipulated that the thoroughbred mares and their foals were boarded at Hill 'n' Dale Farms at all relevant times. Respondent argues that the right of possession of the horses remained vested in Sikura during the years in issue and that Sikura acted as the true owner of the horses rather than as an agent for petitioners. Specifically, respondent contends that prior to September 7, 1982, during the time when Winans and Fowler were still the alleged owners of the horses, Sikura sold two of their foals at public auctions. Petitioners contend that, because it was not practicable to take actual possession of their thoroughbreds, they exercised their right of possession by placing their horses with a responsible breeder. Specifically, petitioners argue that they appointed Sikura as their agent to manage the thoroughbreds. Further, petitioners contend that Malis, as trustee for petitioners, and *742 Sikura reached an oral agreement in April or May of 1982 on a package purchase of all the thoroughbred horses, their offspring, and the remaining breeding rights. This agreement, however, was not reduced to writing until September 1982. In Paccar, Inc. v. Commissioner, 85 T.C. 754, 779 (1985), affd. 849 F.2d 393 (9th Cir. 1988), this Court, in determining whether a sale had occurred, focused on several additional factors related to control of the property purportedly sold. After considering these control factors, this Court concluded that the transaction did not constitute a sale because the seller had retained dominion and control over the property for at least 4 years after the initial transfer. Paccar, Inc. v. Commissioner, 85 T.C. at 781. In the instant cases, however, we conclude that Malis and Malisos, acting as agents for petitioners, exercised significant control over the thoroughbred horses. In particular, Malis, as trustee for petitioners, had final authority over the purchase, breeding, exchange, and resale decisions concerning the thoroughbreds. Malis, therefore, had the right to and did control the use of the thoroughbreds *743 to earn income. Similarly, in Grodt& McKay Realty, Inc. v. Commissioner, supra, this Court held that the taxpayers' purported purchases of cattle were not sales for Federal tax purposes because the taxpayers did not acquire the right to possession, control, or dominion over the cattle. In addition, this Court found that the taxpayers ostensibly paid, primarily through the use of nonrecourse notes, $ 6,000 per head for cows that were worth no more than $ 600 per head. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1238. In the instant cases, however, we have held that petitioners did obtain an equity interest in the horses and breeding rights. Although petitioners paid more than fair market value for the thoroughbred packages, they did invest substantial amounts of cash and assume personal liability for the balance of the purchase price. The weight of the evidence on this factor favors petitioners' position. With respect to the sixth factor, respondent contends that Sikura, not Winans and Fowler, bore the risk of loss of the thoroughbred horses. Respondent points out that Sikura insured the horses boarded at Hill 'n' Dale and *744 that he was the payee/beneficiary on the policies. Respondent, therefore, contends that "petitioners' risk was nil." Petitioners argue, however, that because they did not carry any insurance on the mares or their foals an uninsured loss would have fallen wholly on them. Petitioners also argue that the 18-month right of exchange was a warranty of value rather than protection against the risk of loss. Respondent does not dispute petitioners' characterization of the right of exchange. This factor is neutral because the record does not reflect what uninsured risks would be borne by either party to the sales agreements. With respect to the seventh factor, respondent contends that Sikura received the profits from the breeding and sale of the thoroughbred horses. In support of this argument, respondent notes that Winans and Fowler did not sell any of the mares or their foals to any unrelated third parties. Petitioners contend that, at the time of purchase, there was no agreement that they would resell the horses to Hill 'n' Dale Farms, and the subsequent package sale to Sikura was prompted by a criminal investigation of Malis and his clients by the IRS. In fact, both petitioners resold *745 their thoroughbred packages for a profit, and both petitioners reported gain on the sale of their investment. The weight of the evidence on this factor favors petitioners' position. Finally, with respect to the additional eighth factor, a transaction is considered to have been conducted at arm's length when the two parties are both "economically self-interested" and the transaction is not based on "peculiar circumstances" that would influence the purchaser to agree to a price in excess of fair market value. Bixby v. Commissioner, 58 T.C. 757, 776 (1972). In a true arm's-length sale, the purchase price is at least approximately equal to fair market value. The presence of a totally disproportionate purchase price, however, supports an inference that a true sale has not taken place. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1240-1241. As discussed above, we have concluded that the specified purchase prices far exceeded the fair market values of the horses and breeding rights acquired by petitioners. As discussed below, we conclude that special circumstances surrounding the purchase transactions cause us to limit petitioners' basis *746 to fair market value. Under the other circumstances present, particularly in relation to the other seven factors, we cannot give controlling effect to the disparity between fair market values and agreed purchase prices. On balance, we conclude that the grantor trusts acquired significant benefits and burdens of ownership with respect to the thoroughbred horses. Accordingly, we cannot disregard their ownership of the thoroughbreds for Federal income tax purposes during the years in issue. Amount at Risk
Respondent argues that, if the thoroughbred transactions passed the benefits and burdens of ownership to the grantor trusts, petitioners' losses are nonetheless limited by section 465 because petitioners were not at risk with respect to the promissory notes. Petitioners argue that the entire principal balances of their respective notes constitute true debt. Section 465 provides that, where an individual invests in certain activities, any loss from such an investment shall be allowed only to the extent that the taxpayer is at risk with respect to the activity at the close of the taxable year. Sec. 465(a)(1); sec. 465(c)(1)(C). Borrowed amounts are considered to be at *747 risk where, among other requirements, the amounts have been borrowed for use in the activity, and the taxpayer is personally liable for the repayment of the borrowed amounts or has pledged property, other than property used in the activity, as security for the borrowed amounts. Sec. 465(b)(2). Borrowed amounts are not at risk, however, to the extent such amounts are protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). The language "other similar arrangements" is not specifically defined in the Code, but the legislative history of section 465(b)(4) indicates that the term includes situations where a taxpayer is effectively immunized from any realistic possibility of suffering an economic loss, even though the underlying transaction was not profitable. Levy v. Commissioner, 91 T.C. 838, 863-864 (1988); Larsen v. Commissioner, 89 T.C. 1229 (1987), on appeal (9th Cir., Dec. 12, 1988). Respondent contends that the promissory notes were nonrecourse in substance because the lender, Sikura, looked solely to the collateral, the thoroughbred horses, to secure repayment *748 of the notes. Respondent does not argue that Sikura had any prohibited continuing interest in the transactions other than as a creditor. Respondent does contend, however, that petitioners were protected against loss because the 1979 notes from petitioners to ITBA/Sikura could be offset against the 1982 notes from Sikura to petitioners. Thus, respondent argues that the offsetting notes fully protected petitioners against any real loss. In further support of his argument that petitioners were not at risk for repayment, respondent points out that neither ITBA nor Sikura instituted legal action to collect payments on the notes even though petitioners failed to make any principal payments and stopped making interest payments after 1985. Petitioners claim that they are personally and ultimately liable on their notes to ITBA and that they were not in any way protected against loss with respect to the obligations. Petitioners point out that interest payments were made regularly until 1985, and argue that "a moratorium on payment of the notes was established because of the IRS challenge." Responding to a comment made by the Court at trial, petitioners also argue that the 18-month right *749 of exchange was a warranty and not a protection against loss. Respondent, however, does not dispute petitioners' characterization of the right of exchange as a warranty or argue that the warranty is significant for purposes of section 465. This issue must be resolved by determining who will be the payor of last resort if the transaction goes sour and the security is not adequate to pay off the debt. Levy v. Commissioner, 91 T.C. at 869. Moreover, we must make this determination on the basis of facts existing as of the end of each tax year in issue. Capek v. Commissioner, 86 T.C. 14, 48 (1986). After considering the rights and responsibilities of the participants in these transactions, the only conclusion justified by the evidence is that Sikura is the ultimate creditor and petitioners are the ultimate debtors with respect to the purchase of the thoroughbreds. Under the provisions of petitioners' promissory notes as of the years in issue, if the thoroughbred horses were not adequate to pay off their debts, petitioners were not protected against being personally liable for the unpaid balances of their recourse debt obligations. The preponderance *750 of the evidence is that, at the time the parties entered into the transactions, they intended that the notes would be repaid at the conclusion of the 7-year breeding program. It was only after the participants in the breeding program had become the subject of a criminal investigation by the IRS that petitioners agreed to resell their thoroughbred packages to Sikura. Subsequently, petitioners and Sikura agreed that further payments on their respective promissory notes were to be suspended. Moreover, we are persuaded that, at the time the parties entered into the transactions, Sikura intended to enforce the notes according to their terms. Petitioners, therefore, were not protected against loss. Basis Generally, the basis of property for tax purposes, including depreciation, is cost as determined under section 1012. An exception to the general rule applies, however, where "peculiar circumstances" surround the transactions and the purchaser agrees to a price in excess of fair market value. Bryant v. Commissioner, 790 F.2d 1463, 1466-1467 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; *751 Lemmen v. Commissioner, 77 T.C. 1326, 1347-135O (1981); Bixby v. Commissioner, 58 T.C. 757, 776 (1972). We have concluded that petitioners in these cases paid amounts substantially in excess of fair market value for the broodmares and related breeding rights. These arrangements are also, in our view, affected by "peculiar circumstances" requiring that basis be limited to fair market value. Respondent does not cite Bryant, Lemmen, or Bixby or the rule that they represent even though petitioners address the rule and discuss Lemmen and Bixby in their opening brief. Petitioners assert that the purchase of the property was conducted at arm's length between Malis as trustee and Hill 'n' Dale, ignoring the disparity between prices paid and fair market values and the purported role of ITBA. Petitioners address their argument to the purchase of broodmares and breeding rights as a package, stating: No investment credit was claimed and the difference between amortizing the breeding rights over 5 years and depreciating the horse over 6 years is negligible. Moreover, there were valid economic reasons to seek to obtain breeding rights *752 in connection with the purchase of the broodmares. These objectives are no different than a purchaser obtaining warranties on an automobile or other purchase of tangible property where the objective is to obtain full economic value in the purchase. Accordingly, there are no "peculiar circumstances" which would mandate that the Court ignore the economic bargain that was negotiated and to seek to allocate the purchase price among the economic factors which exist in the bargain. We are concerned here, however, with the excess paid over the combined value of the broodmares and breeding rights. Bryant and Lemmen involved transactions in which purchasers were motivated to allocate a large portion of the purchase price to depreciable animals in order to maximize the anticipated tax benefits from the investment. In Lemmen, we allocated the excess over fair market value to management fees and permitted amortization of the excess amounts as management fees. In Bryant, however, we allocated the excess amount to purchase of tax benefits and did not allow amortization. The Court of Appeals for the Ninth Circuit agreed. See also *753 Houchins v. Commissioner, 79 T.C. 570, 604-605 (1982). In these cases, Malis was hired by petitioners to give them tax advice, and he did so. Malis set up an intermediary entity, ITBA, that had no function as far as his clients, these petitioners, were concerned other than to create the appearance of a three-party transaction. Compare Bixby v. Commissioner, 58 T.C. at 774-780. ITBA supposedly protected Sikura from withholding tax. More significantly, however, the profits of ITBA, if any, were to be split among Sikura; Malis' associate, Simonian; and Malis' brother, Malisos. All negotiations on behalf of petitioners were conducted by Malis, and his conflicting loyalties to Simonian and Malisos negate true arm's-length dealing. There is no evidence that Simonian contributed anything of value to the arrangements, and Sikura and Malisos were otherwise specifically compensated for their contributions. While Malis may have been trying to achieve a "good deal" for everyone, the circumstances were peculiar enough to call for application of the rule limiting basis to fair market value. We conclude that petitioners Winans and Fowler may base their depreciation *754 deductions on the fair market value of the assets acquired, as set forth above, but may not depreciate or amortize any excess. The excess, in our view, was their cost of anticipated tax benefits. See also Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 210 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). Interest Deductions
Respondent asserts that petitioners are not entitled to deduct interest payments on the notes pursuant to section 163 because the amount of the debt exceeds the value of the thoroughbred horses. In Rice's Toyota World, Inc. v. Commissioner, supra, we considered whether a purchase and lease-back arrangement entitled the taxpayers to deductions for depreciation and interest. We concluded that the transaction in question was a sham and disallowed all deductions. The Court of Appeals for the Fourth Circuit affirmed our factual finding of a sham transaction, the disallowance of depreciation deductions, and the disallowance of interest on nonrecourse debt. The Court of Appeals reversed, however, our disallowance of interest arising out of recourse debt and held that a sham *755 determination did not preclude the deduction of interest paid on a recourse note. In Rose v. Commissioner, 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989), we adopted that view and held that even if the notes themselves do not give rise to tax deductions because they were payments for anticipated tax benefits, the interest actually paid on those notes is deductible under section 163. Likewise, in the instant cases, petitioners agreed to an inflated purchase price, paid through the use of recourse promissory notes. Although we have held that petitioners may not base depreciation deductions upon the excess of the purchase price over fair market value, the notes nevertheless represented genuine debt. Consequently, petitioners are entitled to deduct the interest actually paid on their notes. Depreciation Method and Useful Life
Winans and Fowler allocated the basis of the thoroughbred packages to the thoroughbred mares purchased. Both petitioners adopted a useful life of 6 years for the broodmares. Winans depreciated the investment on a straight line basis, while Fowler used the 150-percent declining balance method. Both *756 petitioners claimed a deduction for a full year's depreciation in each year at issue, 1979 through 1982. Respondent argues that, because the breeding rights represent a separate intangible asset with an indefinite useful life, each petitioner's basis in the thoroughbred package must be allocated between the broodmares and the breeding rights. Respondent also contends that petitioners have failed to establish the correct useful life and the proper depreciation period for the thoroughbred packages. Further, respondent argues that petitioners are not entitled to a deduction for a full year's depreciation in 1979, when the thoroughbreds were purchased, or in 1982, when the investments were sold. Petitioners argue that the basis in each thoroughbred package is allocable entirely to the thoroughbred mare purchased. Specifically, petitioners contend that, because the breeding rights were attached to the broodmares when purchased and were nontransferable, the rights do not constitute a separate and distinct asset. Although the experts and our discussion above assign separate values to the identifiable portions of the packages, petitioners purchased them together and necessarily used *757 them over concurrent lives. The difference between separately depreciating the horses and amortizing the breeding rights would be negligible, and we are persuaded that petitioners may depreciate them as a unit. Section 167(a) provides for a depreciation deduction for the exhaustion or wear and tear of property used in a trade or business. Section 167(b) generally permits the depreciation deduction to be computed based on the cost of the property over the period of its useful life. In Rev. Proc. 83-35, 1983-1 C.B. 745, 747, respondent established an asset depreciation range for breeding horses of between 8 and 12 years with an asset guideline period of 10 years. The courts have also determined that the useful life of a breeding horse is approximately 10 years. See, e.g., Finney v. Commissioner, T.C. Memo. 1968-283. A 10-year useful life is consistent with our findings that a female racehorse is normally given the chance to become a broodmare after her 4-year-old racing season and is usually able to conceive until she is approximately 15 years old. Winans acquired the broodmare Pagan Pagan when she was 10 years old, and, therefore, adopted a remaining *758 useful life of 6 years. Similarly, Fowler acquired the broodmares Bellenoble and Calvinia when they were 7 and 9 years of age, respectively. Fowler also adopted a remaining useful life of 6 years. The useful lives adopted by petitioners were consistent with the ages of the broodmares and with the guidelines issued by respondent. Similarly, the depreciation methods adopted by petitioners are permitted by statute and by the regulations. Sec. 167(b) and (c); sec. 1.167(a)-11(c)(1)(iv)(b)(2), Income Tax Regs.
The period for depreciation of property under section 167 begins when the property is placed in service and ends when the property is retired from service. Sec. 1.167(a)-10(b), Income Tax Regs. A retirement of an asset may occur as a result of a sale, and a taxpayer is entitled to claim depreciation for the period of the year up to the date of the sale. Fribourg Navigation Co. v. Commissioner, 383 U.S. 272 (1966). Respondent argues that petitioners must prorate the allowance for depreciation based on the date the assets were acquired in 1979 and when they were sold in 1982. Because petitioners have presented no argument on this issue, respondent's position *759 is sustained. Board and Care Expenses
Respondent argues that the board and care expenses associated with the maintenance of the horses were not ordinary and necessary expenses incurred in carrying on a trade or business because petitioners did not acquire an ownership interest in the horses. Alternatively, respondent argues that even if the board and care expenses were allowable business expenses, petitioners have not adequately substantiated the payments. Specifically, respondent argues that because the board and care expenses were paid by checks to accounts under the control of Malisos, petitioners must further substantiate the payments from Malisos to Sikura/Hill 'n' Dale. We have held that petitioners did acquire the benefits and burdens of ownership of the thoroughbred horses. Accordingly, the board and care expenses associated with the horses were ordinary and necessary business expenses. Petitioners point out that respondent has stipulated to the checks representing their payments for board and care expenses. Petitioners further argue that, although their payments may have remained under the control of Malis and Malisos, the funds were paid by and beyond the *760 reach of petitioners. We agree with petitioners. Even if Malis may have overcharged his clients and diverted the difference to his brother, Malisos, and his associate, Simonian, petitioners paid the stipulated amounts for board and care. Petitioners, therefore, are entitled to deductions for the amounts paid. Gain on Sale of the Investment
Both Winans and Fowler reported their gains on the 1982 sales of the thoroughbreds on the installment basis. Petitioners argue that at the time of the sale they continued to be indebted to ITBA for the unpaid balance of the purchase price. Further, petitioners argue that in 1982 Hill 'n' Dale became indebted to them for the unpaid portion of the sales price. Petitioners cite Connell v. Commissioner, T.C. Memo. 1981-370, as support for their contention that these notes are independent and did not in substance offset each other. Respondent concedes in his brief that the sales of petitioners' thoroughbred packages result in capital gain. Respondent argues, however, that petitioners are not entitled to report the 1982 sales on the installment basis. Specifically, respondent contends that when petitioners resold the *761 thoroughbreds to Sikura they realized sales income in the full amount of their 1979 promissory notes as well as the actual cash payments received. Respondent relies on Rickey v. Commissioner, 54 T.C. 680 (1970), affd. 502 F.2d 748 (9th Cir. 1974), and argues that the cases cited by petitioners are factually different from the circumstances herein. Section 453(a) provides that income from an installment sale shall be taken into account under the installment method. Section 453(b)(1) defines the term "installment sale" as "a disposition of property where at least 1 payment is received after the close of the taxable year in which the disposition occurs." The receipt by a seller of a purchaser's installment note does not constitute payment in the year of sale. Sec. 453(f)(3). On the other hand, cancelation or reduction of a seller's indebtedness to a purchaser as partial consideration in an installment sale is included in determining year-of-sale payments. United States v. Ingalls, 399 F.2d 143, 145-146 (5th Cir. 1968). Mutual debts between a seller and purchaser do not automatically cancel or reduce each other. To the extent that *762 a cancellation in substance has occurred at the time of sale, however, the amount of the indebtedness canceled must be included in computing year-of-sale payments. Rickey v. Commissioner, 54 T.C. at 694-695. The substance and not the form of a transaction will determine whether a transaction qualifies for installment sale treatment. United States v. Ingalls, supra. In Connell v. Commissioner, supra, relied on by petitioners, this Court held that mutual notes between the taxpayer and a purchaser of a trailer park were independent and did not offset. Unlike the circumstances herein, the taxpayer in Connell was jointly liable with another individual on a note payable to the purchaser arising from an entirely separate and distinct real estate transaction. We have held that Sikura, not ITBA, was the true seller of the thoroughbreds. In the instant cases, petitioners' original liability to Sikura and Sikura's subsequent liability to petitioners arose from related transactions involving the same thoroughbred horses and breeding rights. Petitioners argue, however, that the transactions did not involve identical property. *763 Specifically, petitioners contend that the 1979 transaction involved the purchase of a mare and five breeding rights while the 1982 transaction involved the sale of an older mare, foals, and remaining breeding rights. The substance of these transactions, however, was that petitioners' promissory notes to Sikura for the purchase of the thoroughbred packages were effectively discharged by application of Sikura's indebtedness to petitioners for the resale of those same thoroughbred packages. Our conclusion is supported by the decision of the Court of Appeals for the Ninth Circuit in Rickey v. Commissioner, supra. In that case, where the parties had agreed to cancel their mutual debts in a subsequent year, the court refused to give effect to a "formal device" adopted solely for tax purposes. Rickey v. Commissioner, 502 F.2d at 753. After considering the substance of the thoroughbred transactions, we believe the parties intended to offset their mutual promissory notes such that petitioners' notes were effectively discharged when the thoroughbreds were resold to Sikura in 1982. Accordingly, petitioners are not entitled to report their gains on the 1982 sales *764 of the thoroughbreds on the installment basis. Method of Accounting
At the time of the resale of the thoroughbreds to Sikura, Winans and Fowler agreed to increase the principal balances of their promissory notes by 10 percent. These additional 10-percent fees were purportedly paid to ITBA to obtain the release of ITBA's purchase money liens on the thoroughbred mares, foals, and remaining breeding rights. At the time of trial in 1989, neither petitioner had paid the additional 10-percent fee. Each of the grantor trusts, which used the accrual method of accounting, accrued and deducted this fee in 1982. Winans and Fowler, who used the cash method of accounting, subsequently deducted the fees on their respective individual tax returns. Respondent argues that petitioners are required to report their income or loss from the grantor trusts consistent with their own method of accounting, i.e., the cash method. Petitioners contend that, under the regulations, a taxpayer is not restricted to a single method of accounting and that they may elect to use the accrual method of accounting for their horse breeding activities. We have held that ITBA served no valid economic or *765 business purpose in the instant transactions other than for tax purposes and must be ignored. Consequently, we disregarded ITBA's presence in the transactions and concluded that petitioners purchased the thoroughbreds directly from Sikura. Petitioners had no reason to pay additional fees to obtain the release of liens purportedly held by ITBA, and we are not persuaded that, under the circumstances existing in 1982, they intended to or would be expected to pay an additional 10 percent to ITBA. Those fees have not in fact been paid, and there is no reason to believe that ITBA could or would seek to enforce them. Accordingly, regardless of their accounting method, petitioners are not entitled to a deduction for the 10-percent fee. Partnership Level Issues
Respondent seeks to disallow the partnerships' claimed losses on several alternative grounds. We will first address the question of whether the leasing activities, particularly the rental payments agreed to by the partnerships, indicate a realistic potential for profit. Fair Rental Value
Based on our analysis of the transactions and the weight accorded to the expert testimony presented, we conclude that the rental *766 payments for all of the thoroughbred horses in issue were grossly inflated. An important factor in our determination of the fair market value of the thoroughbreds is the cash price paid in prior or contemporaneous sales of the horses. See Brannen v. Commissioner, 78 T.C. 471, 497 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Narver v. Commissioner, 75 T.C. 53, 96-97 (1980), affd. 670 F.2d 855 (9th Cir. 1982). The following chart compares the auction prices Sikura paid to purchase the broodmares, in foal, and the first year's rent the partnerships paid for the same horses: Partnership
First Year's
Expert
& Broodmare
Auction Price
Date
Rent
Appraisal
Uversa
Tertiary
$ 830,000
11/81
$   919,703
$   715,000
Oktaha
225,000
11/81
268,246
250,000
Sopapillo
105,000
11/81
191,606
155,000
Lucinda Light
110,000
11/81
153,284
165,000
Commercial Break
70,000
11/81
153,284
137,500
Chelseanna
--
--
153,284
148,500
Saiko Hour
33,000
11/80
122,627
93,500
Corniche
19,500
12/78
114,963
82,500
$ 2,076,997
$ 1,747,000
Jasmine
Bellenoble
$  77,000
12/78
$   138,000
$    93,500
Binky
--
9/82
207,000
220,000
Susie Bigger
102,125
10/82
173,000
165,000
Think Music
77,000
11/82
138,000
151,250
Well-in-Hand
95,000
11/82
344,000
275,000
$ 1,000,000
$ 904,750
*767 Respondent, on brief, does not rely on the valuations provided by his experts. Petitioners, however, rely on their expert Clark to establish the fair market value of the broodmares as of the lease dates. Clark testified that in a typical broodmare lease the lessee, rather than the lessor, would provide the breeding nominations; the lessor, rather than the lessee, would be entitled to the in-utero foal the broodmare was carrying when the lease was entered into; and the payment terms would be cash. In those circumstances, Clark believed that the value of a leasehold interest would be approximately 25 percent of the value of the broodmare. In the transactions at issue herein, unlike the typical lease described above, the lessor, Hill 'n' Dale, provided the breeding nominations and the lessees, the partnerships, were entitled to the in-utero foals the broodmares were carrying at the time the leases were entered into. Similarly, the payment terms were only 20-percent cash, with the balance deferred and payable over a period of up to 8 years. To value the partnerships' leasehold interests, Clark devised a "leasehold evaluation formula." Using this "leasehold evaluation formula, *768 " Clark concluded that the value of the partnerships' leasehold interests would be the sum of (1) a basic lease value equal to 25 percent of the broodmare's value multiplied by 2 because the first year of the lease covered 2 breeding seasons; (2) the value of the breeding nomination; and (3) an additional 10-percent adjustment for the deferred payment feature. Clark chose a basic lease value of 25 percent of the broodmare's value because he thought that it was "a fair figure." In valuing the broodmares, already in foal at the time the lease was entered into, Clark considered their in-utero foals and projected values for their yearling colts or fillies. Although Clark was valuing the partnership's leasehold interests as of the dates of the leases, his method of valuation involved a 2-year projection of the future values of the yearlings. In making these 2-year projections, Clark assumed that the current 20- to 30-percent increases in yearling prices would continue. Similarly, in projecting the values of the unborn foals, Clark assumed that the then in-utero foals would be born alive and would survive to become yearlings. As with the grantor trusts, Clark valued the breeding nominations *769 on a live foal guarantee basis. The breeding rights that the partnerships purchased, however, were on a no guarantee basis. In valuing the partnerships' leasehold interests, Clark did not account for this difference although he believed that a discount of 20 to 40 percent from the price of a fully guaranteed breeding season might be appropriate in valuing a season with no guarantee. We accepted Clark's appraisals, with some modification, of the thoroughbred horses purchased by the grantor trusts. We conclude, however, that his opinion as to the values of the leased broodmares should be accorded less weight. At trial, Clark conceded that it was difficult to value an in-utero foal as a fetus. Accordingly, Clark did not take into account that the fetus might not be born alive. Because of these flaws in Clark's appraisals of the leased broodmares, we decline to accept his opinion as to the values of the partnerships' leasehold interests. The evidence of contemporaneous auction sales suggests that the partnerships could have purchased the leased broodmares, already in foal, at public auctions for prices significantly less than the first year's rental payments. When, as here, *770 rental payments are grossly inflated by means of deferred indebtedness, serious doubts are raised about whether the activity was entered into for profit. In leasing the thoroughbreds at inflated prices, the partnerships were immediately placed at a tremendous disadvantage. To show a profit, the horses had to generate revenues far in excess of what they could be expected to produce. Thus, the inflated rental payments and the deferred indebtedness that was used to lease the thoroughbreds provide strong evidence that the activities of the partnerships were not engaged in for profit but instead were entered into to reduce taxes by generating large accrued rental expense deductions attributable to the inflated lease payments. The record also contains ample other evidence that the thoroughbred leasing activities were not engaged in for profit within the meaning of section 183. Whether an activity carried on by a partnership is carried on with the requisite profit objective is determined at the partnership level. Brannen v. Commissioner, 78 T.C. at 505. If the activity is not engaged in for profit, the deduction of expenses relating to the activity is allowable only *771 to the extent provided by section 183(b). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. No single factor is determinative; rather, the issue is one of fact to be resolved by examining all of the circumstances. In making this factual determination, however, we give greater weight to objective facts than to petitioners' statements of intent. Sec. 1.183-2, Income Tax Regs.
Petitioners contend that the partnerships conducted their thoroughbred *772 horse breeding activities in a businesslike manner, acquiring thoroughbred broodmares from a reputable breeder, negotiating the leases at arm's length, paying reasonable rental fees that are supported by expert appraisals, keeping required books and records, and managing the breeding activities. Petitioners also argue that the partnerships were organized and managed by Malisos, "who had substantial experience in the thoroughbred industry." Specifically, petitioners argue that Malisos reviewed the pedigrees of the broodmares, prepared estimates of the values of the in-utero foals, and negotiated the rental terms with Sikura on an arm's-length basis. Respondent argues, and we agree, that the amount of time that Malisos devoted to the partnerships did not warrant compensation of $ 3,000 per month per partnership. As previously noted, Malisos had only minimal experience and no formal training in thoroughbred horse breeding. During the years in issue, however, Malisos was president of Uversa, Inc., the general partner of Uversa. During the period 1982 through 1984, Uversa, Inc. was also the general partner of six other limited partnerships that were similarly engaged in horse breeding *773 and leasing transactions. As general partner, Uversa, Inc. was to receive 10 percent of all capital contributions by the limited partners to Uversa. In addition, Uversa was to pay Uversa, Inc. a $ 3,000 per month allowance. Uversa, Inc. received similar compensation for acting as the general partner of the other six limited partnerships. The inflated monthly management allowances the partnerships were obligated to pay, in addition to the inflated rental payments, indicate that the partnerships were operated without a true regard for the profitability of their activities. Respondent also points out that Uversa and Jasmine engaged Turnabuck and Thoroughbred Services, respectively, to board, feed, care for, register, and maintain the thoroughbred horses. For these services, Uversa paid Turnabuck $ 2,000 per month plus $ 15 per day for each broodmare and foal. Similarly, Jasmine agreed to pay Thoroughbred Services $ 1,500 per month plus $ 25 per day for each broodmare and $ 15 per day for each foal. The partnerships were also responsible for reimbursing Turnabuck and Thoroughbred Services for all actual out-of-pocket costs. Jasmine's agreement with Thoroughbred Services never took *774 effect, however, and Jasmine subsequently paid Hill 'n' Dale $ 100,000 for board and care of the leased broodmares and their foals. Turnabuck and Thoroughbred Services were owned by the father of Malis and Malisos. During the years in issue, however, the leased broodmares and their foals were boarded at Hill 'n' Dale in Canada. There is no evidence that Hill 'n' Dale received any specific payments from Uversa or Turnabuck for the board and care of the horses. Similarly, there is nothing in the record to show what, if anything, Turnabuck did to warrant these payments. These board and care payments, therefore, are another indication that the partnerships were operated without regard for profitability. In summary, Malisos had little expertise in thoroughbred horse breeding and devoted a minimal amount of time to the operations of the partnerships. Despite his lack of expertise, Malisos relied on his own appraisal of the thoroughbreds and did not have any type of expert valuation made prior to entering the leases with Hill 'n' Dale. Malisos was aware that Sikura purchased most of the leased broodmares approximately 1 month prior to the lease agreements. Prior to entering into *775 the leases with Hill 'n' Dale, Malisos examined the recent auction sales prices of the horses. In selecting the horses to be leased by the partnerships, however, Malisos did not contact any other breeders. For the foregoing reasons, we conclude that the partnerships were not operated in a businesslike manner. Petitioners argue that the objective of the partnerships was to lease broodmares, rather than purchase them outright, in order to limit the need for capital. In November 1981, Sikura purchased five of the eight broodmares to be leased to Uversa for $ 1,340,000. One month later, Uversa paid $ 415,400 in cash to Hill 'n' Dale to lease the eight horses and deferred the $ 1,661,577 balance of the first year's lease payment. Similarly, in October and November 1982, Sikura purchased three of the five broodmares to be leased to Jasmine for $ 274,125. In December 1982, Jasmine paid $ 500,000 in cash to Hill 'n' Dale to lease the five horses and deferred the $ 500,000 balance of the first year's lease payment. Petitioners contend that the partnerships experienced losses due to adverse and unexpected economic circumstances. Specifically, four of Uversa's first eight foals aborted *776 and three of the remaining foals were poorly conformed. The four live foals were sold at public auction to unrelated third parties for a total sales price of $ 99,901. Jasmine's first-year's foals, as well as the second-year's foals, were resold to Hill 'n' Dale. Malisos had estimated, however, that the partnerships' first-year's foals would bring in revenues of $ 1,355,000 and $ 725,000, respectively. Compounding these problems, the thoroughbred industry entered an economic downturn in 1984. Notwithstanding these adverse developments, petitioners argue that Malisos continued to operate the partnerships in a businesslike manner with the objective of profit. Specifically, petitioners point out that Malisos canceled some leases and substituted other, more valuable, broodmares. Malisos also negotiated and received compensation in the form of a replacement foal for Uversa's loss of four foals. Respondent argues, and we agree, that the partnerships could not benefit from any expected appreciation in the value of the broodmares because the horses remained the property of the lessor, Hill 'n' Dale. Similarly, the fair market values of the foals would have had to appreciate substantially *777 even to approach the rental payments paid by the partnerships. Respondent also points out that during the years of Uversa's and Jasmine's existence, the partnerships reported substantial losses. Uversa reported net losses of $ 2,083,384, $ 1,154,490, and $ 387,608, respectively, on its partnership returns for 1981 through 1983. Similarly, Jasmine reported net losses of $ 727,674, and $ 329,089, respectively, on its partnership returns for 1982 and 1983. We have considered each of the factors set forth in the regulations promulgated under section 183. All factors were considered, but none favors petitioners' contentions. The partnerships could have purchased the broodmares, then in foal, at public auctions for much less than one year's rent. Accordingly, the partnerships' thoroughbred leasing activities were "not engaged in for profit" within the meaning of section 183. Because we sustain respondent's determination with respect to profit objective, we need not decide his alternative arguments for disallowing the partnerships' deductions. Partner Level Issues
Uversa, Inc.
If an activity is not engaged in for profit, section 183(b) separates the claimed deductions *778 into two groups. Section 183(b)(1) allows only those deductions that are not dependent upon a profit objective, i.e., interest and taxes. Section 183(b)(2) allows the balance of the deductions that would otherwise be permitted if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1). We have determined that Uversa's activities were not engaged in for profit within the meaning of section 183. Accordingly, we conclude that the amount of any deductions that Uversa, Inc. may claim is limited to its pro rata share of partnership gross income generated by the thoroughbred breeding activities. Respondent determined that Uversa, Inc. underreported its taxable income by $ 49,662 for its year ended November 30, 1983. The parties stipulated that Uversa, Inc. received payments totaling $ 800,655, but the tax return reported gross receipts of $ 753,685. Respondent's adjustment was the difference between the stipulated gross receipts and the reported gross receipts plus a $ 2,692 capital loss disallowed by respondent. *779 Uversa, Inc. contends that respondent has the burden of proof of unreported income, relying on Herbert v. Commissioner, 377 F.2d 65 (9th Cir. 1966), and Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979). Uversa, Inc. further relies on the testimony of Malisos, who testified generally that an unspecified amount of deposits represented reimbursements and that the deposits were reconciled to the books and records of Uversa, Inc. Malisos' testimony was not supported by any documents in evidence and was thus insufficient to overcome the presumption of correctness discussed in Herbert v. Commissioner, supra.Weimerskirch and cases like it deal with illegal income, which is not involved here. In any event, the rationale of those cases does not apply to the use of bank deposits to determine income. Tokarski v. Commissioner, 87 T.C. 74, 75-77 (1986); see Delaney v. Commissioner, 743 F.2d 670, 672 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; *780 Foster v. Commissioner, 756 F.2d 1430, 1439 (9th Cir. 1985), affg. on this issue and revg. on another issue 80 T.C. 34, 234-235 (1983). Uversa, Inc., not respondent, would have access to proof, if it existed, that certain deposits were reimbursements and not taxable income, and petitioner bears the burden of proving that deposits are not taxable income. Moreover, Uversa, Inc. cannot bootstrap by asserting the reliability of its books and records. See Foster v. Commissioner, supra.Uversa, Inc. failed to prove that respondent's determination of unreported income was erroneous, and that determination will be sustained. Respondent also determined that Uversa, Inc. was not entitled to depreciation deductions for two thoroughbred horses, Gold Futures and Purple Pie, purportedly purchased from Malis in 1982. Uversa, Inc. presented evidence of the purchase of four horses from G. James Sacco and of a subsequent payment of $ 25,000 to Sacco. Respondent, however, argues that no sale took place and contends that "it is more likely than not" any payments to Malis were for his involvement in the partnerships' thoroughbred leasing activities *781 rather than payment for the purchase of these horses. Respondent also points out that, at trial, Malis did not recall selling the horses to Uversa, Inc. Under the circumstances, we do not believe that the evidence presented is sufficient to carry Uversa, Inc.'s burden of proving that a sale did in fact take place. Malisos' testimony as to Uversa, Inc.'s purchase was contradicted by Malis' testimony. Malis should have been, but was not, able to establish whether he owned the horses and sold them to Uversa, Inc. Similarly, Uversa, Inc. did not submit canceled checks or other evidence of payment to Malis for these horses. Finally, Uversa, Inc. has failed to provide support for the allocation of $ 70,000 of the $ 95,000 purchase price to only two of the four horses purportedly purchased. Respondent concedes on brief that Uversa, Inc. is entitled to deductions for commissions or finders' fees paid in connection with the sale of limited partnership interests. Respondent, however, determined that Uversa, Inc. is not entitled to deduct attorney fees of $ 15,329 and $ 62,945 paid in 1982 and 1983, respectively. Uversa, Inc. argues that the attorney fees are ordinary and necessary business *782 expenses deductible under section 162. Other than Malisos' conclusory testimony at trial, however, Uversa, Inc. has presented no evidence to identify the nature of the legal services rendered for these payments. There is nothing in the record to establish whether the fees constitute ordinary and necessary business expenses or whether the fees are organizational or syndication costs of the various limited partnerships that Uversa, Inc. served as general partner. Given the identity of the payees, such evidence should have been available if it existed and supported Uversa, Inc.'s claims. Where the court is convinced that legitimate business expenses were actually incurred, we may, under appropriate circumstances, approximate the amount of expenses that are deductible. Edelson v. Commissioner, 829 F.2d 828, 831-832 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Although Uversa, Inc. may have paid some professional fees relating to its ongoing operations, there is no evidence in the record from which we can allocate between deductible and nondeductible business expenses. *783 Respondent's determination is sustained on this issue. Steinbrecher
As noted above, we have determined that Jasmine's activities were not engaged in for profit within the meaning of section 183. Accordingly, the amount of any expenses that Steinbrecher may deduct is limited to his pro rata share of partnership gross income generated by the thoroughbred breeding activities. Additions to Tax
Section 6653(a)
As set forth above, respondent determined additions to tax against various petitioners on the ground that the underpayments were due to negligence or to intentional disregard of rules and regulations. Petitioners contend that they reasonably relied on Malis, an attorney, CPA, and former IRS agent, and on Malisos, both of whom were knowledgeable about horses. In arguing that the additions to tax should be sustained, respondent reiterates his characterizations of the facts and other information that was available only subsequent to the time of the investments. We have rejected most of respondent's characterizations in our discussion of other issues. The record does not support respondent's argument that petitioners were on notice of those defects *784 relied on by respondent or by the Court in our determination on other issues. We cannot say that petitioners' reliance on Malis was not reasonable, and we conclude that any underpayments are not due to negligence or to intentional disregard of rules and regulations. The additions to tax under section 6653(a) will not be sustained. Section 6659
Under section 6659, a graduated addition to tax applies if the adjusted basis stated in a return is 150 percent or more of the amount determined to be the correct adjusted basis. With respect to the Winans and Fowler grantor trusts, we have determined that petitioners overstated the basis reported on the grantor trust returns. To the extent that depreciation was taken on an overstated basis, there will be an underpayment attributable to those overstatements of basis. Thus section 6659(a) applies to disallowed depreciation deductions claimed by Winans and Fowler for 1981 and 1982, assuming that the recomputed underpayments so attributable are not less than $ 1,000. See section 6659(d). Section 6661
Section 6661 imposes an addition to tax "if there is a substantial understatement of income tax for any taxable year. *785 " Such amounts assessed after October 21, 1986, are equal to 25 percent of the amount of any underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). Section 6661 defines a substantial understatement as follows: SEC. 6661(b). Definition and Special Rules. -- (1) Substantial understatement. -- (A) In general. -- For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of -- (i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $ 5,000. (B) Special Rule for Corporations. -- In the case of a corporation other than an S corporation or a personal holding company (as defined in section 542), paragraph (1) shall be applied by substituting "$ 10,000" for "$ 5,000". The amount subject to the addition to tax may be reduced in accordance with the following: SEC. 6661(b). Definition and Special Rule. -- * * * (2) Understatement. -- * * * (B) Reduction for understatement due to position of taxpayer or disclosed item. -- The amount of the understatement *786 under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. (C) Special rules in cases involving tax shelters. -- (i) In general. -- In the case of any item attributable to a tax shelter -- (I) subparagraph (B)(ii) shall not apply, and (II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. (ii) Tax shelter. -- For purposes of clause (i), the term "tax shelter" means -- (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. (3) Coordination with penalty imposed by section *787 6659. -- For purposes of determining the amount of the addition to tax assessed under subsection (a), there shall not be taken into account that portion of the substantial understatement on which a penalty is imposed under section 6659 (relating to addition to tax in the case of valuation overstatements). Petitioners contend that there was substantial authority for the positions taken on their respective tax returns, contending that this lesser standard applies to each of them because their respective investments were not tax shelters as defined in section 6661(b)(2)(C)(ii). Because petitioners have not satisfied the lesser standard, we need not discuss the higher standard applicable to tax shelters. In Antonides v. Commissioner, 91 T.C. 686 (1988), on appeal (2d Cir. and 4th Cir., Feb. 17, 1989), we stated that substantial authority refers to legal precedents that would support the taxpayers' application of the law to a given set of facts, and an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue. *788 91 T.C. at 702-703. We sustained the addition to tax under section 6661 after comparing the facts of the cases cited by the taxpayers with those found in Antonides. Similarly, here, our determination with respect to deficiencies resulting in the grantor trust cases from overstatements of basis shows that these cases are distinguishable from those in which taxpayers paid fair market value for an asset. The facts from which we concluded that Uversa, Inc.'s leasing transactions were not accompanied by a profit objective distinguish these cases from those in which similar deductions were permitted. These petitioners, therefore, cannot rely on such other cases as establishing substantial authority. They are liable for the additions to tax under section 6661 to the extent that respondent has made claim for such additions and the recomputed underpayments are substantial within the meaning of section 6661(b)(1)(A). Section 6621(c)
Section 6621(c) provides for interest at the rate of 120 percent of the normal rate (under section 6601) with respect to any substantial underpayment attributable to certain enumerated tax-motivated transactions. A valuation overstatement *789 under section 6659(c) is one of those enumerated transactions. Sec. 6621(c)(3)(A)(i). Thus, petitioners Winans and Fowler are liable for additional interest on that portion of their underpayments attributable to valuation overstatements, as determined in relation to section 6659. Under section 6621(c)(3)(B), the Secretary of the Treasury has regulatory authority to specify other types of transactions to be treated as tax motivated for purposes of section 6621(c). Under the authority delegated to him to designate by regulation other types of tax-motivated transactions, the Secretary has promulgated temporary regulations, section 301.6621-2T, Q-4, Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 59394 (Dec. 28, 1984), including deductions disallowed for any period under section 183 among transactions deemed to be tax motivated. We have found that the leasing transactions engaged in by the partnerships were activities not engaged in for profit under section 183. Underpayments resulting from disallowance of those deductions, therefore, are subject to section 6621(c). As with respect to the sections 6659 and 6661 additions to tax, final determination of petitioners' *790 liability for additional interest depends on whether the recomputed underpayments are substantial within the meaning of the applicable sections. Respondent stipulated that the Winans and Fowler Trusts are grantor trusts, and therefore not taxable. Accordingly, no deficiency exists with respect to the trusts. Decisions will be entered for the petitioners in docket Nos. 12684-83 and 23383-86. In all other dockets, to reflect the foregoing and concessions by the parties, Decisions will be entered under Rule 155. Footnotes
*. Cases of the following petitioners are consolidated herewith: A. Ross Winans and Irene L. Winans, docket Nos. 13781-83, 16789-84, 12364-85, and 24330-86; Swainn Grantor Trust, a/k/a A. Ross Winans, Grantor Trust, A. Ross Winans, Co-Trustee, docket No. 23383-86; C. Douglas Fowler and Edna Fowler, docket Nos. 22984-83, 20239-84, 16429-85, and 22951-86; Uversa Ltd., Inc., docket No. 17733-87; Edward Steinbrecher, docket No. 37873-86; and Jasmine Associates, Ltd., Nesmine Dev. Corp., Tax Matters Partner, docket No. 40729-86.↩
*. For taxes the last date prescribed for payment of which is after December 31, 1981, section 6653(a) was revised and divided into section 6653(a)(1) and (a)(2). ** 50 percent of the interest due on the deficiency. *** 50 percent of the interest due on $ 131,200. **** Docket No. 40729-86 is a partnership level proceeding involving the redetermination of partnership items under a Notice of Final Partnership Administrative Adjustment (FPAA).↩
*. The mare Well-in-Hand and her foal died during foaling. The foal was insured, and Jasmine received $ 68,400 in insurance proceeds.↩
*. 20 percent interest↩